# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-3756

———————

| | |
|---|---|
| Townsend Industries, Inc., | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * Southern District of Iowa. |
| United States of America, | * |
| | * |
| Appellee. | * |

———————

Submitted: May 16, 2003

Filed: September 15, 2003

———————

Before BOWMAN and BYE, Circuit Judges, and ERICKSEN,[1] District Judge.

———————

BOWMAN, Circuit Judge.

This is a case about the taxability of business and entertainment expenses spent on a Canadian fishing trip. After the Internal Revenue Service determined that the per-employee cost of Townsend Industries' annual fishing trip was wages, it assessed deficiencies against the company for the 1996 and 1997 tax years. Townsend paid a portion of the deficiency and filed a 26 U.S.C. § 7422 (2000) suit seeking a refund. After a bench trial, the District Court found in favor of the Government, held that the

———————

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, sitting by designation.

expenses involved in the trips were employee wages within the meaning of the Internal Revenue Code, and ruled that a portion of these wages should have been withheld for income tax and Social Security and Medicare taxes. Townsend appeals that decision, and we reverse.

Townsend Industries, based in Altoona, Iowa, manufactures the T-51, a product that allows offset printers to produce two-color documents in a single pass through the printing press. For the last forty years, Townsend has gathered its salespeople[2] for an annual, two-day meeting at its headquarters involving its corporate staff and some factory workers. Following that meeting, the company has sponsored a four-day expense-paid fishing trip to a resort in Ontario, Canada (two of the four days spent traveling to-and-from the resort on a bus). Aside from a dinner at which the company owner, Robert Townsend, and its CEO, John Jorgenson, spoke about the state of the company, the employees and salespeople spent their time largely as they wished (though the vast majority fished). Nevertheless, business discussions were conducted on an on-going basis during the trip.

We apply the same standards of review that we apply in other cases when we review a district court's decision in a taxpayer's suit to reclaim taxes paid. See United States v. Boyle, 469 U.S. 241, 249 n.8 (1985). Accordingly, we review the District Court's findings of fact for clear error and its conclusions of law de novo. Boles Trucking, Inc. v. United States, 77 F.3d 236, 242 n.3 (8th Cir. 1996) (citing Boyle, 469 U.S. at 249 n.8). The District Court's holding that Townsend failed to establish that its trips had a business purpose is a legal conclusion that we review de novo. Cf. Boyle, 469 U.S. at 249 n.8 (explaining that presence of elements constituting "reasonable cause" is a question of law).

---

[2]Townsend's salespeople are not company employees; rather, they are independent business owners.

The question of whether the per-employee cost of the trips amounted to taxable wages and whether Townsend should have withheld a portion of these costs turns on whether each employee could have deducted these costs as business expenses. A taxpayer may exclude certain fringe benefits from his or her gross income and thereby avoid paying income tax on these benefits. Section 132(d) of the Internal Revenue Code excludes "working condition fringe" benefits from an individual's wages and provides that "'working condition fringe' means any property or services provided to an employee of the employer to the extent that, if the employee paid for such property or services, such payment would be allowable as a deduction under section 162 or 167." 26 U.S.C. § 132(d) (2000).

In turn, § 162(a)(2) allows a deduction for "traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business." 26 U.S.C. § 162(a)(2). Any deduction for travel and entertainment is substantially limited by § 274, which disallows deductions for certain expenses and provides heightened reporting requirements. Section 274(a)(1)(A) disallows deduction for entertainment expenses:

> With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item *was directly related to, or*, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item *was associated with, the active conduct of the taxpayer's trade or business*.

26 U.S.C. § 274(a)(1)(A) (emphasis added). Section 274(d) adds an important substantiation requirement and forbids deductions for entertainment expenses:

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility or property, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility or property, or receiving the gift.

26 U.S.C. § 274(d)(4).

The Treasury Department has promulgated regulations that provide a further gloss on the Internal Revenue Code and that govern whether "working condition fringe" benefits and travel and entertainment expenses are deductible. For purposes of this case, 26 C.F.R. § 1.132-5 (2003), which governs "working condition fringes," adds nothing. Section 1.162-2, which deals with traveling expenses, adds some important requirements to the deductibility of travel expenses and § 1.162-2(a) provides that "[o]nly such traveling expenses as are *reasonable and necessary* in the conduct of the taxpayer's business and *directly attributable to* it may be deducted." 26 C.F.R. § 1.162-2(a) (emphasis added). The regulation then explains that where personal and business travel are mixed, travel expenses may only be deducted "if the trip is related primarily to the taxpayer's trade or business." 26 C.F.R. § 1.162-2(b)(1). However, even if the trip is not primarily business-related, expenses "which are properly allocable to the taxpayer's trade or business" may still be deducted. Id.

The regulations governing § 274 of the Internal Revenue Code add additional requirements for this section's "directly related to" and substantiation requirements. Section 1.274-2(c)(3) add's four requirements that the taxpayer must meet in order to deduct entertainment and travel expenses. The expense will only be considered directly related to, or associated with, the active conduct of business if:

(i) . . . the taxpayer had more than a general expectation of deriving some income or other specific trade or business benefit . . . .
(ii) . . . the taxpayer actively engaged in a business meeting, negotiation, discussion, or other bona fide business transaction, other than entertainment, for the purpose of obtaining such income or other specific trade or business benefit . . . .
(iii) In light of all the facts and circumstances of the case, the principal character or aspect of the combined business and entertainment . . . was the active conduct of the taxpayer's trade or business . . . It is not necessary that more time be devoted to business than to entertainment to meet this requirement. The active conduct of trade or business is considered not to be the principal character or aspect of combined business and entertainment activity on hunting or fishing trips . . . unless the taxpayer clearly establishes to the contrary.
(iv) The expenditure was allocable to the taxpayer and a person or persons with whom the taxpayer engaged in the active conduct of trade or business during the entertainment . . .

26 C.F.R. § 1.274-2(c)(3)(i)–(iv). Temporary regulations govern the "adequate records" requirement in § 274(d) and explain that in the absence of written, contemporaneous records, the taxpayer must establish the business nature of the expense "[b]y his own statement, whether written or oral, containing specific information in detail . . . and [b]y other corroborative evidence sufficient to establish" the business nature of the expense. Id. § 1.274-5T(c)(3)(i)(A)–(B).

What these many statutes and regulations boil down to is a requirement that Townsend prove that its fishing trips were reasonable and necessary business expenses that were directly related to, or associated with, the active conduct of Townsend's business. Further, Townsend must demonstrate its business purpose by showing: that it had more than a general expectation of deriving some income or other trade or business benefit from the trip; that its employees actively engaged in business meetings, negotiations, discussions, or other bona fide business transactions; and that the principal character of the combined business and entertainment was the

-5-

active conduct of Townsend's trade or business. Finally, Townsend faces an evidentiary hurdle and must prove the business nature of its expenses by "adequate records," by its own statements, or by other corroborative evidence.

The District Court determined that Townsend failed to establish a business purpose and ruled in favor of the Government. The District Court first determined that the "fishing trips were not an ordinary and necessary business expense in light of the lax attendance policy for the trip, and the disconnect between the sales meeting and the fishing trip." Order at 7 (Aug. 21, 2002). Notwithstanding Townsend's unusual, inclusive business philosophy, the District Court determined that there was only a brief business meeting held during each of the trips and that it could not say that "a voluntary, company-wide, all-expense-paid, employer-sponsored fishing trip with one brief business meeting [was] an ordinary and necessary business expense." Id. at 8. Nor, the District Court ruled, could Townsend have met the test set out in § 1.274-2(c)(3)(i)–(iv). The District Court concluded that each trip was "not an integral part of Townsend employees' ability to perform their jobs, it was not a part or a continuation of a sales meeting, but rather was a relaxed and fun event where business was discussed as part of the background to the primary fishing endeavor." Id. at 10. Further, Townsend's general "expectation to derive uncertain future benefits, particularly in the way of improved comradery [sic] and relations among its employees and sales personnel[,] . . . is not enough to allow the trips to qualify as directly related under section 274(a)." Id. Further still, the District Court concluded that Townsend could not establish "that its trips were associated with the active conduct of its business" because the trips were not conducted before or after a business discussion and, therefore, the "business discussions that occurred in Iowa on Monday and Tuesday were too far distanced temporally from the fishing trip that took place the following four days for this Court to find the 'associated with' test met." Id. at 10–11. Finally, the District Court concluded that, in any event, Townsend failed to meet the substantiation requirements insofar as the witnesses' recollections of fishing trips from different years ran together and the trial testimony

"lacked the necessary specificity" about Townsend's business purpose. Id. at 12. We disagree with the District Court's holding that the evidence presented at trial failed to establish a business purpose for Townsend's 1996 and 1997 trips.

Simply put, the testimony elicited at trial clearly established that the 1996 and 1997 trips were business trips and that Townsend properly excluded the trip expenses from its employees' gross income. Although the amount of contemporaneous, written evidence was negligible, Townsend and the Government provided sufficient "statement[s] . . . containing specific information in detail . . . to establish" the business nature of the trips. 26 C.F.R. § 1.274-5T(c)(3)(i).[3]

In the first place, we cannot agree that District Court's conclusion that the voluntary nature of the trips rendered them an undeductible business expense. Although the trips were voluntary, nearly all of the Townsend employees who testified felt an obligation to attend and some felt that it was part of their job. Moreover, Robert Townsend, the owner, testified that while he felt it would be antithetical to his business philosophy to make the trips mandatory, he and other senior management "definitely encourage" employees to attend and that "[w]hat we want to do is to get them to go, and we do lean on them." Trial Tr. at 21, 31. John Jorgensen, the CEO, testified that "I encourage them to go. I visit with them about the fishing trip, about the activities. I definitely encourage everyone to go." Id. at 98. Jorgensen further testified about specific attempts he made to encourage different

---

[3]In this case, the lack of contemporaneous, written evidence is not entirely surprising for two reasons. First, Townsend followed the same practice and procedure (without interference) for its annual trip since instituting it in the 1960's. Second, one salesperson explained (during the Government's cross-examination) that the absence of some of the written corroboration could be attributed to Townsend's corporate culture: "They love surprises." Trial Tr. at 329.

employees to attend the event.[4]  Dean Evans, the chief engineer, added that he felt a responsibility to attend and that, for his part, he did not even look forward to the event:

> I like the environment up there.  It's very beautiful, but it's actually the culmination of a year's worth of work, because the fishing trip is where we launch products, introduce it to our staff, and so it's a pretty tough time.  Usually we've been at it pretty hard to get it done at that particular date, so it's trying times.

Trial Tr. at 196.  In short, the record leaves us with little doubt but that the Townsend employees viewed the annual trip as part of their regular course of business.

---

[4]For instance, Dale Hoover, the purchasing manager and a Government witness, testified as follows:

> Q: [Government] And did you feel obligated to go on the fishing trip?
> A: [Hoover] I would say–that's a good question.  I would say out of respect for my employer, I feel obligated to go.  Out of respect for my career and the responsibility of my job duties, I feel obligated to go.
>      Has anybody ever said, "Dale, you must go"?  No, but I feel it's my duty to.
>      We could go on a tennis trip, and I would still feel obligated to go and I don't play tennis, so . . .
> Q: And is part of that, as you say, respect for your employer?  You appreciate that your employer is a generous man and has offered you this–to take you to this fishing lodge?
> A: I guess I don't really look at it as a vacation.  It's nice because it has to do with a particular sport I like to do, and I am very appreciative of the opportunity, but I still believe it's a job function.

Trial Tr. at 421–22.  Having elicited this testimony, the Government quickly ended its direct examination of Mr. Hoover.

More so than the voluntary or involuntary nature of the trip, the real crux of the matter for Townsend is the extent to which it could prove the trips were a reasonable and necessary business trip; whether they were directly related to, or associated with, the active conduct of Townsend's business; and whether the principal character of the events was the active conduct of business. Our review of the entire record convinces us that the business nature of the trip was well established by the witnesses who testified both for and against Townsend. Although some witnesses did admit that the several-dozen annual trips ran together, more witnesses agreed that specific Townsend-related business was conducted during the 1996 and 1997 trips and that certain business-related activities were always conducted.

For instance, a number of witnesses testified that in 1996 many discussions focused on the need to introduce a new model to compete with the Ryobi 3302 press and that in 1997, the new Anniversary Edition (AE) press was introduced. Dean Evans described the genesis of the AE press saying:

> In '96, the fishing trip in '96, there was some competition for our product. It was called a 3302 Ryobi, and it was beating us up pretty good, so a lot of people wanted us to come up with something more user friendly that would compete directly and enhance the product enough that people would look our way rather than to the Ryobi 3302, and that was probably the initiation of the AE, because that was what we tried to develop, something to compete directly with the 3302.

Trial Tr. at 197. For his part, Russell Brock, an independent distributor, testified that "there would have been a tremendous amount of discussion about [the new press] at the fishing trip." Id. at 303. He further testified, during the Government's cross-examination, that "I think the purpose of the sales meeting fishing trip was to launch the AE [Anniversary Edition press]" and that Townsend intended to "show it to us at

the sales meeting.  We would then have any discussions that we needed to on the fishing trip as a carryover." Id. at 327.  The testimony of David DeJoode, Edward Kalupa, and Roger Perin regarding the conception and birth of the AE press was to the same effect.

In addition to testimony about the Anniversary Edition press, many witnesses testified about discussions regarding the complexity of the T-51 press and problems that customers, employees, and salespeople (who also repaired the machine) had with its 800 parts.  For example, Edward Kalupa and Russell Brock (independent salespeople) both testified that they had discussions with several Townsend employees regarding the cylinder problems in Townsend's 4610 model.  Id. at 262–63, 307, 309; see also id. at 264–65, 295 (problems with the 1650 model in 1996), 253–57, 295 (problems with S-1 model in 1996).  Many witnesses also testified that the fishing trips were a unique opportunity for the national sales team to interact with the Townsend employees who manufacture and assemble the intricate parts and those who send out replacement parts.  This interaction was important, they stated, because small changes in the attention that the factory workers paid to their work (such as removing all the burrs on metal parts) had a major impact on the amount of repair work the sales force had to do and decreased the number and frequency of repairs.  See e.g., id. at 38.  Thus, the opportunity for one of the independent salespeople to tell a Townsend employee in person about his six-hundred mile round trip to repair a press damaged by too many burrs left on a gear made a major impression.  More generally, factory employees and sales people stated that they gained a better understanding of Townsend's business at these events.  See, e.g., id. at 423.

Further, replacement parts are a major part of Townsend's business and both the sales staff and the Townsend employees involved in parts distribution indicated that improvements (such as new parts codes and increased accuracy in the parts sent) were conceived on the trips.  Id. at 231–32, 310.  In fact, such was the pace of life at

the Townsend plant that one employee in the parts department indicated that the fishing trip was one rare opportunity that he had to have a reasoned conversation with his supervisor about their work.  Id. at 488–89; see also id. at 228 (supervisor confirms conversation).

Another particularly telling piece of evidence that buttresses our conclusion that Townsend met its burden and established a bona fide business purpose for its trips is the fact that Townsend stopped including its plastics division in the annual trip in 1994, three years before Townsend sold the division.  The division was sold and its employees excluded from the annual meeting because:

> Their product was becoming different than just the plastic we needed that we bought it for, so that company was getting into a business that was somewhat foreign to us, and . . . it was becoming a disruption during our T-51 press division sales meetings, our fishing trip, our meetings afterwards, so we felt to get the best business and the best results, we separated those trips and did not include the plastic division in 1996 and 1997 on our trip and in our sales meeting.

Id. at 75–76.  This decision, to our minds, indicates that Townsend clearly had a specific business purpose for these trips.  If Townsend was merely providing a free vacation to its salespeople and employees, it would not have mattered if they continued to include the plastics division.

We need not rehash the extensive trial testimony relating to sales tactics, see, e.g., id. at 212–13, 271–72; quality control, see, e.g., id. at 310–11; issues relating to specific clients, see, e.g., id. at 264–65, 267–68; and other problems solved or discussed on the 1996 and 1997 trips, see, e.g., id. at 237–38 (molleton & aqua-flow parts), for the trial record that we have reviewed is replete with evidence of specific and general business benefits that Townsend realized from the trips.  Contrary to the District Court's conclusion that Townsend merely had a general "expectation to derive

-11-

uncertain future benefits, particularly in the way of improved comradery [sic] and relations among its employees and sales personnel," Order at 10, we conclude that Townsend had a realistic expectation to gain concrete future benefits from the trip based on its knowledge of its own small company, its knowledge of the utility of interpersonal interactions that probably would not occur but for the trip, and its knowledge of its own past experience. As such, the trips and their expenses qualified as working condition fringe benefits under § 132 and a bona fide business expense under §§ 162 and 274 of the Internal Revenue Code. Necessarily, we also conclude that the trial record developed by Townsend and the Government provided adequate substantiation in the form of its "own statement[s] . . . containing specific information in detail [and] [b]y other corroborative evidence sufficient to establish" the business nature of the expense. 26 C.F.R. § 1.274-5T(c)(3)(i)(A)–(B).

The Government urges that Danville Plywood Corporation v. United States, 899 F.2d 3 (Fed. Cir. 1990), governs the case at hand. We think that case, which concerned the deductibility of a corporate trip to the Super Bowl, is distinguishable from the case at hand. In Danville, the Federal Circuit held that the taxpayer was unable to demonstrate that its Super Bowl weekend trip was a reasonable and necessary business expense and was directly related to, or associated with, the active pursuit of its business. In so holding, the Federal Circuit emphasized that on the narrow facts presented to it, it was compelled to rule that "[t]he Super Bowl weekend," which involved spouses and children, "appears to have been little more than a group social excursion with business playing a subsidiary role." Id. at 9. Here, in contrast, there was no lack of evidence concerning specific and general business discussions and the attendant benefits. Moreover, the absence of spouses and children in this case is important for, as more than one Townsend employee noted, the trip was not some sort of paid vacation because, logically enough, "I don't go on vacation with 60 people I work with. I go on vacation with my wife and kids." Trial Tr. at 361.

-12-

Nor do we think the present case is like <u>Hippodrome Oldsmobile, Inc. v. United States</u>, 474 F.2d 959 (6th Cir. 1973), a case in which the parties conceded that "the company customers entertained [on the boat] were not subjected to any specific exposure to taxpayer's products or suggestion that they buy them while being thus entertained" and that the taxpayer was merely using the boat to generate future good will. <u>Id.</u> at 960. In the case at hand, as we have noted, the employees and salespeople were exposed to Townsend products, a new Townsend product was initiated and subsequently introduced during the years in question, complaints and suggestions were discussed about current Townsend products, and Townsend business practices were discussed at length. Given this evidence, we conclude this was not a case where the taxpayer had no specific business purpose and was merely trying to generate good will. <u>See</u> <u>Rowell v. Comm'r.</u>, 884 F.2d 1085, 1088 (8th Cir. 1989) (holding that expenses related to hunting and fishing trips were not directly associated with the active conduct of taxpayer's business where taxpayer was often not present and only had an "expectation of future goodwill"); <u>Berkley Mach. Works & Foundery Co. v. Comm'r.</u>, 623 F.2d 898, 904 (4th Cir.) (holding that expenses related to company-owned hunting lodge were not business expenses because, at most, company merely derived "general business goodwill"), <u>cert. denied</u>, 449 U.S. 919 (1980); <u>Handelman v. Comm'r.</u>, 509 F.2d 1067, 1071–75 (2d Cir. 1975) (holding that expenses related to forty-six foot sailing sloop "Chee Chee V" were not deductible based on "unspecific and imprecise evidence with no corroboration" of a business purpose for the vessel).[5]

_____

[5]Section 1.274-2(c)(3)(iii)'s requirement that the "principal character" of the expense be the active conduct of business does not mean that more than fifty percent of the time be spent on business. 26 C.F.R. § 1.274-2(c)(3)(iii). Rather, that regulation explicitly states that "[i]n light of all the facts and circumstances of the case, the principal character or aspect of the combined business and entertainment to which the expenditure related was the active conduct of the taxpayer's trade or business." <u>Id.</u> The regulation then adds that "[i]t is not necessary that more time be devoted to business than to entertainment to meet this requirement." <u>Id.</u> Instead, the fifty percent of time or use requirement can be found in regulations pertaining to pre-1979 expenditures on airplanes, yachts, and other facilities. <u>See</u> 26 C.F.R.

We pause to note that our decision does not stand for the proposition that in all cases in which a corporation sponsors hunting, fishing, or other trips to "luxury" vacation spots that the sponsoring corporation can avoid including the per-employee cost of the trip in its employees' wages merely by presenting testimony relating to business allegedly conducted during the sojourn. A district court should be suspicious of oral, non-contemporaneous evidence provided in such cases, see 26 C.F.R. § 1.274-5T(c)(1); Reynolds v. Comm'r., 296 F.3d 607, 616 (7th Cir. 2002); and it may well be that in most cases the cost of these trips would amount to income taxable to each employee. This caveat notwithstanding, in the case at bar, we have little trouble concluding that Townsend Industries presented adequate evidence to substantiate its business purpose. Though we have reached this conclusion as a matter of law, even if "business purpose" were to be treated as a question of fact, we are satisfied the nature and quantity of the evidence presented could compel no reasonable conclusion other than that Townsend had a bona fide business purpose for its 1996 and 1997 trips. Accordingly, the decision of the District Court is reversed and the matter remanded with instructions to enter judgment in favor of Townsend Industries.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

§ 1.274-2(e).

-14-