T.C. Memo. 2014-208

UNITED STATES TAX COURT

RICHARD H. CULLIFER, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20177-11.                    Filed October 7, 2014.

R issued a notice of transferee liability to P to collect N's
unpaid Federal income tax pursuant to I.R.C. sec. 6901. R argues that
under Texas State law: (1) P has transferee liability with respect to a
special dividend that N distributed to P and (2) P has transferee-of-
transferee liability with respect to P's proceeds from his sale of N
stock.

<u>Held</u>: P is a transferee under Federal law principles pursuant to
I.R.C. sec. 6901.

<u>Held</u>, <u>further</u>, under Texas State law, P has transferee liability
with respect to the special dividend.

<u>Held</u>, <u>further</u>, under Texas State law, P has transferee-of-
transferee liability with respect to the proceeds from the sale of N
stock.

**[\*2]**   William O. Grimsinger, Renesha N. Fountain, and Rita Renee Huey, for petitioner.

Robert M. Morrison, Joseph A. Peters, Candace M. Williams, Katelynn M. Winkler, Courtney M. Hill, and Julie Ann P. Gasper, for respondent.

## MEMORANDUM OPINION[1]

LARO, Judge:  In a notice of liability, respondent determined that petitioner is liable for $9,030,205 plus interest as a transferee of the assets of Neches Industrial Park, Inc. (Neches or sometimes NIP).  The underlying tax liabilities involved in this case are Neches' Federal income tax deficiencies and penalties for the taxable years ending September 30, 2003 and 2004 (years at issue).  Petitioner resided in Florida when he filed his petition.

---

[1]This case was tried before Judge Diane L. Kroupa in September 2013.  On June 16, 2014, Judge Kroupa retired from the Tax Court.  On June 18, 2014, the Court issued an order informing the parties of Judge Kroupa's retirement and proposing to reassign this case to another judicial officer of the Court for purposes of preparing the opinion and entering a decision based on the record of trial or, alternatively, allowing the parties to request a new trial.  On July 17, 2014, both parties filed a response consenting to the reassignment of this case.  On July 23, 2014, the Court issued an order assigning this case to Judge David Laro.

**[*3]**  The primary issue in this case is whether petitioner is liable for Neches' tax liabilities for the years at issue as a transferee pursuant to section 6901.[2]  For the reasons stated herein, we hold that he is.

<u>Background</u>[3]

I.  <u>Richard H. Cullifer</u>

Petitioner attended Florida State University for college and graduated with a degree in finance.  After graduation petitioner worked at several banks, including in C&S Bank's commercial banking program.  While at C&S Bank, petitioner became acquainted with Henry Weitzman, whose business partner was a C&S Bank customer.  Mr. Weitzman taught petitioner "the ropes" on real estate development.  At some point, petitioner decided to leave the commercial banking business and to go into real estate development.  Petitioner stayed in the real estate business and is currently a commercial real estate developer and operator.

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Because of the reassignment of this case for purposes of preparing the opinion and entering the decision, we did not have an opportunity to observe the demeanor of witnesses.  We therefore make no inferences of credibility except those which may be judged from the written record.

[*4] II.     Neches

In 1992 Mr. Weitzman told petitioner about a business opportunity involving Cantex Chemicals, Inc. (Cantex), a company created to hold a chemical storage site that he and two partners had purchased in 1988. The site was in Beaumont, Texas, and included a port facility. Petitioner visited the site but decided not to pursue that opportunity because of personality conflicts with one of Mr. Weitzman's business partners (Texas partner).

In 1993 following the death of the Texas partner, Mr. Weitzman contacted petitioner regarding Cantex. Petitioner visited Cantex, but this time he was given a tour by William (Bill) Castleman, the on-site manager. After inspecting the docks, petitioner realized that Cantex was a unique facility that had potential. At around this time Ken Tummel, executive vice president of Continental Nitrogen Resources (CNR), alerted petitioner to opportunities in the ammonia storage and import business. On the basis of his research into the ammonia business petitioner learned that America's demand for ammonia exceeded its supply. In addition, most American ammonia plants were built in the 1960s, energy inefficient, and located inland. Petitioner therefore concluded that there was an unmet market demand for coastal ammonia import and storage facilities.

[*5]   In 1994 Mr. Weitzman bought out his partners' interests in Cantex.  Around that time petitioner became an officer and director of Cantex.  The Cantex property was, as petitioner described, "absolutely a disaster".  Originally a fertilizer plant built in the late 1960s by the Mobil Chemical Agricultural Division, Cantex was full of asbestos and had concrete retainage ponds full of old chemicals, and its fertilizer production, bagging, and warehouse facilities had not been in use for decades.  Petitioner hired an environmental remediation firm to clean up the entire site and disposed of everything on site with the exception of the warehouses, a 10,000-ton ammonia tank built by Chicago Bridge & Iron, pipe racks, rail tracks, a wooden dock, and an office building.  Petitioner also built a new dock.  Finally, petitioner purchased from Exxon an anhydrous ammonia storage facility with a 35,000-ton ammonia tank in Great Falls, Montana.  Petitioner hired an engineering firm to dismantle the Exxon facility and reconstruct it on the Cantex site.  Following petitioner's rehabilitation plans, the Cantex site's final storage capacity was approximately 45,000 tons.

Petitioner did not like the name Cantex and renamed the company Neches Industrial Park, Inc., after the Neches River on which it was located.  Petitioner was Neches' sole officer and director, and in 1996 he became a 50% shareholder as well.  The other 50% shareholder was Furtivus, Inc., a Canadian corporation

[*6] owned by the Weitzman family. Robert Thomas[4] served as Neches' longstanding attorney, and accounting firm Funchess, Mills & White (Funchess) served as Neches' accountant. Funchess prepared Neches' quarterly and annual financial statements, employment tax returns, Federal and State income tax returns, and State franchise tax returns.

Although Neches initially offered only ammonia storage services, over time, it provided sulfur, glycol, and liquid asphalt storage services as well. By 2000 petitioner had grown Neches into a business with monthly revenue of $300,000 to $400,000. Neches' tenants included DuPont, A&A Fertilizer, Ltd., CNR, ChemCycle, Inc., and Martin Gas Sales, Inc. (Martin).

Petitioner worked at Neches full time until approximately 1998, returning to Florida every weekend to be with his family. In 1998 petitioner hired more employees to handle the day-to-day operations of Neches and transitioned to a business development role. Since petitioner's business development work could be performed remotely, petitioner began working increasingly from his office in Jupiter, Florida. The office building was owned by Rich International, an S corporation wholly owned by petitioner. Starting around 1996 Rich International

---

[4]Mr. Thomas is certified by the Texas Board of Legal Specialization in estate planning, probate law, and tax law. Over the past 25 years, Mr. Thomas has represented clients in over 100 corporate purchase and sale transactions.

[*7] began sending Neches monthly invoices for petitioner's "management fees". These management fees included petitioner's travel and office expenses[5] and were not subject to a written management agreement between Neches and Rich International.

Starting in 2000 petitioner became interested in selling Neches. Between 2000 and 2003, petitioner engaged in discussions with several companies--e.g., Duke Energy, Buckeye Pipeline, Kinder Morgan Liquid Terminals, LLC (Kinder Morgan), and Kaneb Pipe Line Partners L.P.--regarding the possible sale of Neches.

III.  MidCoast Investments, Inc.

In June 2003 Jim Lelio, an executive at Kinder Morgan, introduced petitioner to Graham (Paul) Wellington of MidCoast Investments, Inc.

---

[5] During this time petitioner was also engaged in the development and operation of a restaurant chain called Quarterdeck. Petitioner focused on real estate acquisition and development for the restaurants, while his partner, Paul Flanigan, handled the restaurants' day-to-day operations. Because petitioner performed work for both Neches and the Quarterdeck restaurants out of his Florida office, petitioner charged half of the office expenses to Neches and the other half to Buffalo Holdings, Inc. (Buffalo Holdings), a C corporation petitioner created to invest in his restaurant business. These office expenses included salary and health benefits for petitioner's secretary, as well as Rich International's loan payments on the office building.

[*8] (MidCoast).[6] MidCoast was looking for companies that fit a certain

"acquisition profile"--i.e., C corporations that had recently experienced large

taxable gain. Mr. Wellington explained to petitioner that buyers prefer to buy

assets for a step-up in basis and that sellers prefer to sell stock, thus triggering

only a single level of taxation. Mr. Wellington further explained that MidCoast

could help buyers and sellers achieve the best of both worlds by buying a company

shortly before or after its sale of assets. MidCoast would in turn employ high-

basis, low-market-value assets--e.g., charged-off receivables--to offset the taxable

gain from the asset sale in their "asset recovery business". In addition, MidCoast

would pay sellers a premium calculated on the size of the taxable gain. On July

23, 2003, Mr. Wellington sent petitioner a letter stating:

> It was a pleasure speaking with you regarding MidCoast Investments'
> acquisition criteria. As discussed, MidCoast in [sic] interested in
> purchasing the stock of certain C-corporations. In instances where a
> C-corporation has sold its assets, MidCoast may have an interest in
> purchasing 100% of the stock for a price significantly higher than the
> shareholders might otherwise realize. MidCoast pursues these
> acquisitions as an effective way to grow our parent company's asset
> recovery operations. It is important to note that after MidCoast
> completes its stock acquisition, the target company is not dissolved or

---

[6]We observe that MidCoast has been involved in a number of transactions in cases that have come before us. See, e.g. Hawk v. Commissioner, T.C. Memo. 2012-259; Feldman v. Commissioner, T.C. Memo. 2011-297; Starnes v. Commissioner, T.C. Memo. 2011-63, aff'd, 680 F.3d 417 (4th Cir. 2012); Griffin v. Commissioner, T.C. Memo. 2011-61.

[*9] consolidated, but re-engineered into the asset recovery business and ultimately becomes an income producer for MidCoast.

Enclosed was a MidCoast promotional brochure, which described its history,[7] its target corporation profile, and the benefits that it provides.

Between August 2003 and May 2004 petitioner and Mr. Wellington kept in routine contact. Petitioner kept Mr. Wellington informed about his efforts to sell Neches and even spoke highly of Mr. Wellington and MidCoast to potential buyers Martin Midstream Partners, L.P. and Kaneb Pipe Line Partners, L.P. In January 2004 petitioner told Mr. Wellington that a closing in 2004 "looks good".

In June or July 2004 Mr. Wellington and Donald Stevenson, director of corporate acquisitions of MidCoast Financial, Inc. (also MidCoast),[8] met with

---

[7]According to the promotional brochure, MidCoast Credit Corp. was founded in 1958 as a network of mortgage banking branches throughout the northeastern United States. In 1996 MidCoast Credit Corp. shifted its focus to the asset recovery business and became a buyer of "charged-off debt portfolios from major banking institutions". In 1997 MidCoast Credit Corp. formed MidCoast Investments, Inc., to "identify and acquire corporations suitable for conversion into the asset recovery business".

[8]In May 2004 MidCoast Investments, Inc., sold all of its assets to MidCoast Financial, Inc. We refer to both entities as MidCoast. References to MidCoast for dates before May 2004 shall be to MidCoast Investments, Inc. References to MidCoast for dates after May 2004 shall be to MidCoast Financial, Inc.

[*10] petitioner in Jupiter, Florida.[9] During this meeting petitioner inquired about transferee liability. Mr. Stevenson explained that as long as the corporation held enough assets to discharge its liabilities, no transferee liability would exist.

IV. Morgan Joseph & Co., Inc.

Meanwhile, in July 2003 petitioner attended a Merrill Lynch seminar regarding investment banking for small businesses. At the seminar, petitioner met an investment banker at Merrill Lynch named John Stuart, who later introduced him to Omar Abboud, a managing director at the investment banking firm of Morgan Joseph & Co., Inc. (Morgan Joseph), who specialized in the chemical industry.

In August 2003 petitioner spoke with Mr. Abboud about Neches' history, its current financial state, its plans for future development and growth, and his desire to sell Neches. Mr. Abboud was impressed by petitioner's success in developing Neches and believed that a number of companies would consider Neches an attractive acquisition target. Petitioner told Mr. Abboud and his associate, Kelly Walters, that many of Neches' potential acquirers were master limited partnerships (MLP), which could not purchase Neches stock. Petitioner further explained that

---

[9]Although Mr. Wellington had previously resigned from MidCoast Investments, Inc., during the sale to MidCoast Financial, Inc., he attended the meeting with petitioner at Mr. Stevenson's request.

[*11] because of the low inside basis of Neches' assets, an asset sale would not be tax efficient.[10]  Following their conversation, Mr. Abboud and Mr. Walters began researching "potential creative structure(s) that could mitigate or circumvent" petitioner's conundrum.

On September 11, 2003, Mr. Abboud and Mr. Walters held a conference call with petitioner to discuss a PowerPoint presentation prepared by the Morgan Joseph team.  The PowerPoint presentation covered Neches' valuation, potential buyers and their acquisition criteria, an efficient transaction structuring alternative, and the team's recommendations.  On a slide titled "Structuring Considerations", the Morgan Joseph team explained why stock transactions were preferred by sellers, why asset transactions were preferred by buyers, and how to use an NOL intermediary as a "Tax-Efficient Alternative".  According to Morgan Joseph, the use of an NOL intermediary was an "[i]nnovative structure [which] maximizes cash to seller while eliminating need for additional investment by buyer in order to achieve passthrough status."  The Morgan Joseph team recommended that the best way for petitioner to maximize the value of Neches was for Morgan Joseph to create an "auction environment" through an "orchestrated sale process" to sell

---

[10]In an email dated September 5, 2003, petitioner told Mr. Abboud that the inside basis of Neches' assets was approximately $10 million and told Mr. Abboud to assume that his outside basis in Neches stock was zero.

[*12] Neches' assets and then to hold a separate bidding contest "among various NOL companies who are interested in buying shell companies with post-sale cash and tax liabilities".

Following the conference call, petitioner decided not to hire Morgan Joseph because of his existing connections with many of the potential buyers and because of Morgan Joseph's sizable retainer fees. However, petitioner stayed in contact with Mr. Abboud and kept Mr. Abboud updated on the status of various deals that he was working on.

V.    Sale of Neches' Operating Assets

In April 2004 petitioner met with executives from Kinder Morgan regarding the sale of Neches' assets. Negotiations lasted all day, and the parties reached a "hand-shake deal" at a baseball game of petitioner's son. Kinder Morgan wished to close the transaction by June 1, 2004. On May 3, 2004, Neches and Kinder Morgan signed a nonbinding term sheet regarding the sale of Neches' operating assets.

On May 6, 2004, petitioner called Mr. Wellington of MidCoast and informed him of the asset sale to Kinder Morgan. On May 7, 2004, Mr. Wellington sent petitioner a letter requesting Neches' most recent financial statements and tax returns, an updated tax basis of the assets being sold, and

[*13] various other financial information so that he could "revise the comparative stock acquisition exhibit premised on the $26m asset sale". Mr. Wellington further represented that if he received the requested information by next week, he could "almost guarantee MidCoast will meet your intended timeframes and maximize your net proceeds".

The Kinder Morgan deal did not go through. Martin, one of Neches' tenants, held a right of first refusal to purchase Neches' assets within 10 days of a purchase agreement. On May 11, 2004, Neches notified Martin of the pending sale to Kinder Morgan. On May 28, 2004, Martin notified Neches that it would exercise its right of first refusal. On June 1, 2004, Neches and Martin entered into a purchase and sale agreement in which Martin agreed to purchase for $25.5 million all of Neches' operational assets (including land, tanks, dock facilities, rails, buildings, pipelines, and all other physical facilities affixed to the land). Martin also purchased Neches' intangible assets, including its contracts, goodwill, licenses and permits, intellectual property rights, and rights in insurance proceeds.

Pursuant to the purchase and sale agreement, Neches retained its preclosing liabilities, including a prepaid lease obligation to Koch Nitrogen International Sarl

[*14] (Koch),[11] litigation liability relating to a title dispute in a newly constructed ammonia tank,[12] and environmental liabilities. In addition, the purchase and sale agreement required Neches to set aside funds from the purchase proceeds into various escrow accounts (collectively PAT and Koch escrows), including: (1) $300,000 in a "PAT Tank Repair Escrow" account;[13] (2) $140,000 in a "Port Arthur Tank Escrow" account; and (3) $2,500,000 in a "Koch Lien Escrow" account.[14]

---

[11]In or around 2000 Neches entered into a lease agreement with Duke Energy (Duke) scheduled to begin in November 2005. Pursuant to the lease agreement, Duke made a $2.5 million "prepaid rent" payment to Neches. When Koch purchased Duke, Duke assigned its Neches lease to Koch. Kinder Morgan was concerned that a natural disaster would render the Beaumont site unable to deliver on Neches' lease obligations, and it negotiated for petitioner to be liable for such contingencies.

[12]In late 2003 petitioner hired a company called Port Arthur to construct two ammonia storage tanks (PAT tanks), which were completed in early 2004. During water tests, one of the tanks experienced foundation failure. As a result of the construction defect, petitioner did not make the final payment on the PAT tanks, resulting in a mechanic's lien of $138,000 on the tanks.

[13]Pursuant to the purchase and sale agreement, Neches was responsible for the repair costs of the defective PAT tank. Thus, if repair costs were less than $300,000, Neches would be refunded the difference from the "PAT Tank Repair Escrow". If repair costs exceeded $300,000, Neches would pay Martin the difference. Repair costs ultimately totaled $181,000, leaving the "PAT Tank Repair Escrow" with $119,000 belonging to Neches.

[14]Pursuant to the purchase and sale agreement, unless Martin defaulted on

(continued...)

**[\*15]** Also on June 1, 2004, petitioner signed a noncompetition agreement with Martin which precluded him from entering the ammonia storage and handling business within the United States and from engaging in general terminaling services within 150 miles of the Gulf Coast for a term of 10 years. As consideration, Martin paid petitioner $1.5 million, with $1 million due at closing and $50,000 paid each year for 10 years.

On June 1, 2004, Martin wired $26,284,778.02 in asset purchase proceeds to an escrow account at the Beaumont Title Co. On June 2, 2004, after various expenses had been paid and the PAT and Koch escrows had been funded from the asset sale proceeds, Beaumont Title Co. transferred $21,270,547.75 to Neches' Merrill Lynch bank account. Also on June 2, 2004, Beaumont Title Co. transferred $1 million to petitioner's personal bank account.[15]

Following the asset sale to Martin, Neches had no operating assets and could no longer operate as an ammonia facility. In connection with its purchase of

---

[14](...continued)
the Duke lease agreement as a result of force majeure, Neches would receive from the escrow account $104,166.67 on the last date of each month starting on November 30, 2005, and continuing until no funds were left in escrow.

[15]Petitioner did not report the $1 million as income on his personal 2004 Federal income tax return.

[*16] the Neches assets, Martin also hired approximately half of Neches' employees. Shortly thereafter, Neches terminated the employment of its remaining employees.

## VI. Stock Enhancement Transaction

While the asset sale was pending, on May 13, 2004, Mr. Abboud told petitioner about a firm that "provides the same services as Midcoast albeit using a different structure. * * * The attraction to this group is that I believe they will pay you more than Midcoast for the stock of the company." Mr. Abboud asked petitioner who he was using for tax counsel, and petitioner put Mr. Abboud in contact with Mr. Thomas and Keith Kelly, a certified public accountant (C.P.A.) and vice president of Funchess.

On May 28, 2004, petitioner wrote to Mr. Thomas regarding his plans after the close of the Martin asset sale:[16]

> Robert, remember as we get into Pat Tank, Koch, etc - all escrow accounts, names need to be something besides Neches. Next step after Tuesday (assuming it happens) is to wind Neches down and sell Neches stock to "stock enhancement group"--NY wall street deal--I can explain this to you.

---

[16]Petitioner waived in writing the attorney-client privilege as to Mr. Thomas' representation in these transactions.

[*17] Petitioner understood that the buyer in a stock enhancement transaction viewed the acquired company's tax liability as an asset that it could utilize. On July 2, 2004, petitioner explained the stock enhancement transaction to Mr. Thomas as follows:

> Stock enhancement is based entirely on tax liability. The fed & state tax liability is the magical amount of cash that has to be in Neches. * * * I was simply trying to find an easy path forward to getting Yacht Club,[17] escrows and misc A/R out of Neches in order to execute [the] stock enhancement deal.

A.    Morgan Joseph Hired To Orchestrate Stock Enhancement Transaction

At some point before June 7, 2004, petitioner received a letter of intent from MidCoast offering to purchase Neches at a $2.7 million premium--the purchase price in excess of Neches' fair market value. Petitioner forwarded MidCoast's offer to Mr. Abboud. Mr. Abboud was surprised that MidCoast had offered a premium representing 39% of Neches' Federal tax liability, rather than the 33% that MidCoast traditionally used to calculate its premium payment.

Morgan Joseph offered to orchestrate a sale of Neches' stock for a $450,000 fee. This fee was based on the difference between the premium offered by

---

[17]Yacht Club Holdings, L.P. (Yacht Club), is a partnership engaged in the development of commercial office buildings. At the time, Yacht Club was owned 90% by Neches and 10% by the Richard H. Cullifer Revocable Trust (RHC Trust), which petitioner had created.

[*18] MidCoast (39% of Neches' Federal tax liability) and the premium offered by another company (65% of Neches' Federal tax liability).  On June 16, 2004, petitioner, as president of Neches, signed an engagement agreement to hire Morgan Joseph to render financial and advisory investment banking services for the sale of Neches stock.[18]

B.     Mr. Thomas Sounds Warning Bells

On June 18, 2004, Mr. Thomas wrote to petitioner expressing concerns about the viability of the stock enhancement transaction:

> After talking with Omar, I still have the same feeling that any buyer of the stock may not be able to get the tax benefits they think they will get if they ever get audited.  But, that won't be OUR issue as long as we carefully limit our reps and warranties in the sale agreement. * * *

Mr. Thomas concluded:

> DO NOT SIGN ANY LETTER OF INTENT OR ANYTHING ELSE REGARDING A POTENTIAL NIP STOCK SALE UNTIL YOU LET ME REVIEW/BLESS IT FROM THE LEGAL END.  WE DON'T WANT TO GET TRAPPED HERE.

On June 29, 2004, Mr. Thomas wrote to Mr. Walters and Mr. Abboud seeking certain representations and warranties in a stock purchase and sale

---

[18]Although petitioner signed the engagement agreement in his capacity as president of Neches, Morgan Joseph's objective was to maximize the value of the Neches stock.

**[*19]** agreement, including: (1) petitioner would not warrant that MidCoast could achieve the desired tax outcome; (2) MidCoast would not be entitled to any purchase price reduction if, on audit, the desired tax outcome is not achieved; (3) MidCoast would bear the costs of a tax audit; and (4) MidCoast would indemnify petitioner against any tax claims arising from the transaction. That same day, Mr. Abboud replied stating:

> I don't believe anyone will give you what you are requesting. It amounts to a road map for anyone challenging the deal.
>
> Richard is selling the stock of his company. If a buyer sees value in the tax attributes, whatever they are (NOL's, etc), so be it. We wouldn't ask for your specific protections in a straight stock sale under any other circumstances.
>
> I agree that Richard needs protection in the agreements, but I would think that a Rep that the buyer is acquiring ALL liabilities other than x,y,z would suffice.

On June 30, 2004, Mr. Thomas replied:

> Well, Omar, actually it just amounts to me looking out for my client. I'm not trying to kill a deal, make a sale or make a commission here. Where I am from, there is a time-honored axiom of high finance which goes like this: pigs git fat, and hogs git et.

### C.    Pre-Stock-Sale Asset Transfers

After the sale of Neches' operating assets to Martin and before the Neches stock sale, petitioner caused Neches to transfer many of its remaining assets to

[*20] entities controlled by petitioner and entities controlled by the Weitzman family--i.e., Furtivus, Inc. (Furtivus), Hawco, Inc. (Hawco), and Tapel Financial Corp. (Tapel).

During May through August 2004 Neches made the following cash transfers to Rich International,[19] Yacht Club and Buffalo Holdings:

| Recipient | Date | Amount |
|---|---|---|
| Rich International | 5/6/2004 | $50,000 |
| | 5/24/2004 | 25,000 |
| Yacht Club | 5/7/2004 | 10,000 |
| | 5/24/2004 | 10,000 |
| | 6/4/2004 | 200,000 |
| | 7/31/2004 | 249,860 |
| | 8/3/2004 | 50,000 |
| Buffalo Holdings | 6/4/2004 | 200,000 |

In addition, on June 20, 2004, Neches assigned the $2.5 million "Koch Lien Escrow" account to Yacht Club. On July 6, 2004, Neches paid $39,481.36 to Toyota of Stuart for the purchase of a Toyota 4 Runner, which was recorded in its general ledger as a management fee to Rich International. Finally, on August 3,

---

[19]These cash transfers are in addition to the management fees that Neches paid to Rich International for petitioner's services and expenses.

[*21] 2004, Neches sold its 90% interest in Yacht Club to Buffalo Holdings, in exchange for a $3,294,382.14 promissory note from Buffalo Holdings.

With respect to the Weitzman family, on June 3, 2004, Neches paid $1,562,952 to Hawco to retire its debts to Furtivus and Hawco. In addition, on June 14, 2004, Neches transferred $5,320,355.76 to Tapel.

### D. Petitioner Selects MidCoast for Stock Enhancement Transaction

On July 2, 2004, Mr. Abboud and Mr. Walters held a conference call with petitioner to discuss a bid summary that the Morgan Joseph team had prepared. The bid summary compared the purchase offers of three companies--Krilacon, Red Bridge, and MidCoast.

|  | Krilacon | Red Bridge | MidCoast |
| --- | --- | --- | --- |
| Purchase price | $11,552,083 | $11,210,000 | $10,523,753 |
| Assumed tax liability | $6,612,925 | $6,856,660 | $6,856,660 |
| Shareholder premium | $4,212,925 | $4,113,996 | $3,428,330 |
| Percent of tax liability | 63.7 | 60 | 50 |
| Premium amount over original MidCoast premium offer | $1,584,947 | $1,486,018 | $800,352 |

Because petitioner had brought MidCoast "to the table", Morgan Joseph's fees for a stock sale to MidCoast was $275,000, rather than the $450,000 fee for a sale to Krilacon or Red Bridge, whose involvement Morgan Joseph had secured. In

[*22] addition to the purchase price, MidCoast agreed to reimburse petitioner for the $275,000 fee.

Petitioner performed minimal due diligence for the stock sale. Although petitioner asked Mr. Thomas to check the bidders' references, petitioner did not instruct any of his advisers to research the bidders' financial situation, their history or operations, the status of previously acquired companies, how the desired tax outcomes would be achieved, or the legality of the stock enhancement concept.

The MidCoast references Mr. Thomas called were Mark Fullmer, Gerald Mogg, and Robert Barron.[20] Mr. Thomas did not ask any of the references what happened to the companies after the transaction, nor did he question them about the transaction's tax aspects or potential risks.

Even though MidCoast offered the lowest shareholder premium, petitioner ultimately selected MidCoast for the stock enhancement transaction. According to petitioner, MidCoast was his top choice because he had developed a level of comfort and familiarity with MidCoast from his prior interactions with MidCoast

---

[20]Mr. Fullmer was an attorney who had represented a client in a recent stock sale to MidCoast. Mr. Mogg was a seller-side accountant involved in a prior stock sale. Finally, Mr. Barron had represented a client in the stock sale to MidCoast but was currently MidCoast's attorney for the Neches stock sale.

[*23] and from seeing its name for many years on a building along I-95 in Palm Beach County, Florida.

At the request of Morgan Joseph, MidCoast submitted a revised letter of intent dated July 9, 2004, for a proposed acquisition of 100% of Neches' stock at a $3,814,729 premium. On July 9, 2004, petitioner, personally and as president of Furtivus,[21] signed the revised letter of intent.

On July 16, 2004, Mr. Thomas wrote to petitioner suggesting that he consider hiring an additional attorney to represent him in the stock sale to MidCoast. Mr. Thomas explained that he and MidCoast's lawyers could start "digging in against each other" over certain terms which would "protect us if the Services comes calling" and "keep you from being any worse off than if you just dissolved NIP and took the cash." Such terms include "Midcoast's indemnity of you for any taxes, penalties, interest due on IRS audit of our 2003-2004 tax return" and an "agreement not to liquidate NIP and Midcoast for a period of years (3-5 maybe)."

---

[21]Petitioner was appointed the president of Furtivus in spring of 2004 to facilitate the sale of Neches' assets to Martin and to sign related documents.

**[*24]** E.     Petitioner Becomes 100% Shareholder of Neches

Upon further reflection, Furtivus decided that it did not want to proceed with the MidCoast stock enhancement transaction.  On August 16, 2004, Neches executed a stock redemption agreement to redeem Furtivus' interest in Neches for $7,250,000.  The stock redemption agreement was to be effective June 30, 2004, before the date on which Furtivus signed the MidCoast letter of intent.  On August 17, 2004, Neches wired the stock redemption payment to related-entity Hawco.

F.     Special Dividend to Petitioner

On August 19, 2004, petitioner, as sole director of Neches, caused Neches to declare a special dividend to himself of $3,727,121.10.  In satisfaction of that dividend, Neches assigned to petitioner:  (1) a Hibernia National Bank operating account of $7,171.58; (2) the "Port Arthur Tank Escrow" account of $140,000; (3) the "PAT Tank Repair Escrow" account of $119,000; (4) a Chemcycle loan receivable of $8,075.02; (5) insurance premium refunds of $158,492.47; and (6) the Buffalo Holdings promissory note of $3,294,382.14.  The cumulative value of the assets distributed was $3,727,121.21.

G.     Neches' Balance Sheet as of August 24, 2004

Following the Martin asset sale, William (Keith) Kelley of Funchess prepared Neches' compiled financial statements as of August 24, 2004, and

[*25] calculated Neches' tax liabilities as of that date. In performing these duties, Mr. Kelley did not audit Neches' books nor review its general ledger for accuracy. Since Neches had not engaged in any transactions following the special dividend and before the stock sale, Neches' balance sheet appeared as follows on both August 19 and 25, 2004.

<u>Assets</u>

| | |
|---|---|
| Cash | $6,228,170 |
| Accrued interest receivable | 4,800 |
| Total Assets | 6,232,970 |

<u>Liabilities</u>

| | |
|---|---|
| Accrued Federal income tax | 5,972,050 |
| Prepaid estimated tax | (243,000) |
| Accrued Florida income tax | 18,992 |
| Accrued Texas franchise tax | 746,542 |
| Total liabilities | 6,494,584 |

<u>Shareholder's equity</u>

| | |
|---|---|
| Total equity | (261,614) |

In calculating Neches' Federal income tax liability, Funchess did not reduce Neches' taxable income by the accrued Texas franchise tax because that expense is not deductible until it is paid.

[*26] H.    MidCoast Stock Purchase and Sale Agreement

Meanwhile, on August 4, 2004, Chandrakant Shah, part owner and manager of MidCoast, created Neches Holdings, LLC (Neches Holdings), to be the acquiring entity in the Neches stock sale transaction.  MidCoast was Neches Holdings' sole member and manager.

On or around August 10, 2004, MidCoast sent Mr. Thomas a draft purchase and sale agreement (PSA) for the purchase of Neches stock.  This agreement identified Neches Holdings as the buyer.  Mr. Thomas was alarmed by this substitution and wrote to petitioner:

> One thing right off the top that should be a deal killer--where the hell did Midcoast go?  If we do the deal with "Neches Holdings, LLC, a Delaware LLC" we might as well be going with "Red Bridge" or "Krilacon".  The business risk to you without Midcoast or other party with money is that there is no one there to step up and honor the indemnity for tax liabilities fye [(for year ending)] 9/30/04 which would otherwise be due on corp asset sale to Martin if IRS comes calling in 2005, or Neches Holdings does something screwey post stock sale that gets us in trouble with IRS or whoever.  Seems to me Midcoast must be a party or at least guarantee the performance of all obligations, etc of Neches Holdings under the agreement.

On August 25, 2004, a share purchase agreement was executed among MidCoast, Neches Holdings, Neches, and petitioner.  The agreement provided that MidCoast would pay petitioner $3,486,433 in return for all outstanding Neches stock.  The agreement further provided that Neches Holdings would be

[*27] responsible for filing and paying Neches' State and Federal income tax liability for the fiscal year ending September 30, 2004 "to the extent that such tax liability is due given the Company's post-closing business activities". On the same day, Neches Holdings borrowed $3,386,433 from MidCoast by demand note.

The law firm Berger Singerman acted as the escrow agent for the transaction. The purpose of the escrow arrangement was two-fold: to ensure that the cash would remain in Neches when ownership was transferred, and to ensure that Neches was being purchased using outside funds. Pursuant to the share purchase agreement, on August 25, 2004, Neches wired $6,232,970 and MidCoast wired $3,593,353 to a Berger Singerman trust account. On August 26, 2004, Berger Singerman wired $6,232,970 from its trust account to an account held by Neches. Also on August 26, 2004, Berger Singerman wired $3,486,433 into an account held by petitioner. On August 27, 2004, Berger Singerman wired the remaining $106,920 to MidCoast. After closing, MidCoast paid $275,000 to Morgan Joseph for petitioner's investment banking fees. Petitioner did not report the gain from the sale of Neches stock on his personal 2004 Federal income tax return.[22]

---

[22] An Internal Revenue Service (IRS) audit of petitioner's 2004 personal tax return in 2007 revealed that petitioner had failed to report the $1 million

(continued...)

[*28] VII.   <u>MidCoast and Neches Holdings' Post-Stock-Sale Transactions</u>

Following the stock sale and unbeknownst to petitioner, MidCoast and Neches Holdings engaged in a number of transactions to further remove assets from Neches and to offset its taxable gain.

On August 31, 2004, Neches wired $5,317,970 to MidCoast in return for a demand note from Neches Holdings (first demand note).  On September 23, 2004, Neches wired another $189,920 to MidCoast in return for another demand note from Neches Holdings (second demand note).

On September 24, 2004, Neches Holdings sold Neches to Wilder Capital Holdings, LLC (Wilder), and as consideration, Wilder assumed the liabilities for the first and second demand notes.  Wilder was owned by Craig Stone, Larry Austin, and Walter Schmidt, who also owned Bay Area Business Enterprises, Ltd. (BABE), the Starwalker Group, LLC (Starwalker), and Korea Star Distressed Asset Fund, LLC (Korea Star).  On that same day, Neches declared a dividend to Wilder, distributing the first and second demand notes.  Also on September 24, 2004, Neches declared a special dividend to Craig Stone and Korea Star and wired

_____

[22](...continued)
noncompete payment and the gain from his sale of Neches stock.  Shortly thereafter, petitioner paid the deficiency, penalties, and interest resulting from these omissions.

[*29] $500,000 to BABE as payment for the special dividend. These transactions left Neches with a negative cash balance.[23]

On September 28, 2004, Wilder contributed a 90.39% interest in a Michael Carrie, Inc., loan (MCI loan) to Neches.[24] The MCI loan was part of a portfolio of distressed debts purchased at auction by BABE for $300,000 on December 26, 2003.

VIII. Neches' Federal Income Tax Return

Neches' Federal income tax return for the period ending September 30, 2004, was signed by Craig Stone as president and was received by the IRS on April 11, 2005. On this return, Neches reported capital gain of $15,246,396 from the asset sale and $5,307,598 of rental income. To offset some of that gain, Neches claimed a loan basis of $17,870,854.81 in the MCI loan and a bad debt loss of $17,781,501. Neches claimed a $825,388 loss on its tax return for the period ending September 30, 2004. On May 10, 2005, the IRS received from Neches a Form 1139, Corporation Application for Tentative Refund, which

---

[23]On September 10, 2004, before the stock sale to Wilder, Neches also wired $100,000 to Starwalker and $125,000 to BABE, entities affiliated with Wilder.

[24]Michael Carrie, Inc., was a clothing manufacturer in the New Jersey area that had gone out of business in the late 1990s.

[*30] claimed an NOL carryback of $825,388 for the tax year ended September 30, 2004. On June 13, 2005, the IRS issued a refund to Neches of $126,294, which was deposited into a BABE account a day later. In addition, the IRS had previously refunded Neches' prepaid taxes of $243,000 on December 9, 2004, which had also been deposited into a BABE account on January 11, 2005.

IX.    IRS Audit of Neches

In 2007 and 2008 respondent conducted an investigation into Neches' taxable years ended September 30, 2003, and September 30, 2004. On April 8, 2008, respondent mailed Neches a notice of deficiency, which disallowed a deduction for management fees of $976,076, a deduction for professional fees of $262,529, and a $17,781,501 bad debt loss for the MCI loan. The notice of deficiency was returned to the IRS unclaimed. Neches did not respond to respondent's examination nor did it file a petition with the Tax Court in response to the notice of deficiency. On August 6, 2008, respondent assessed the tax and penalties set forth in the notice of deficiency for the years at issue.

| TYE Sept. 30 | Deficiency | Penalty sec. 6662 |
|---|---|---|
| 2003 | $126,294 | $50,518 |
| 2004 | 6,363,993 | 2,489,400 |

[*31] Revenue Officer Jerry Young (RO Young) was assigned to collect on Neches' outstanding tax. RO Young filed notices of Federal tax lien with the Texas and Florida secretaries of state and sent copies to Neches. He further sent Neches a Form 1058, Notice of Balance Due, informing Neches of its collection appeal rights. Neches did not respond to these letters.

RO Young checked various Internal Revenue Service internal databases for bank accounts held by Neches and levied, mostly unsuccessfully, on the accounts that he had found. RO Young also investigated Neches' tangible assets and determined that Neches had no tangible assets from which to collect. Accordingly, RO Young determined Neches' tax liabilities for the years at issue to be noncollectible outstanding accounts.

On January 6, 2009, respondent sent petitioner a letter informing him that the IRS was conducting a transferee liability examination of petitioner concerning Neches' tax liabilities for the years at issue. On June 2, 2011, respondent sent petitioner a notice of liability.

X.   Expert Witnesses

The parties presented expert testimony on a number of disparate matters. Petitioner presented the report and testimony of expert witness S. Todd Burchett to prove that Neches was solvent at the time of the stock sale. Mr. Burchett is a

[*32] certified public accountant (C.P.A.), senior appraiser accredited by the American Society of Appraisers (ASA), and certified in financial forensics and accredited in business valuation by the American Institute of Certified Public Accountants (AICPA). Mr. Burchett maintained that under a solvency analysis, the Texas franchise tax is assumed to have been paid and therefore would be treated as a deductible expense. Treating the franchise tax as a deductible expense would have reduced Neches' Federal income tax liability by $283,686, resulting in equity of $22,072. Accordingly, Mr. Burchett concluded that Neches was not insolvent as of August 19 and 25, 2004.

Respondent presented the reports and testimonies of two expert witnesses-- Francis Burns and Steven Hastings. Mr. Burns is a senior appraiser accredited by the ASA, is accredited in business appraisal review by the Institute of Business Appraisers, holds a master's degree in finance and economics, and has over 25 years of valuation experience. Mr. Hastings is a C.P.A., is certified in financial forensics by the AICPA, and has over 20 years of financial and valuation experience.

Mr. Burns submitted two reports: one valuing Neches' intangible assets as of August 25, 2004, and the other valuing a 90.39% interest in the MCI loan. With respect to Neches' intangible assets, Mr. Burns noted that pursuant to its

[*33] purchase and sale agreement with Martin, Neches sold the following intangible assets: rights to intellectual property, including patents and trademarks; licenses and permits used in operation; accounts, instruments, and intangibles; and goodwill. Mr. Burns concluded that following the asset sale Neches no longer had any "going concern value" because it had disposed of all of its income-generating assets and had no continuing earning power. Mr. Burns further concluded that any "personal goodwill" arising from petitioner's special skills or reputation could not be capitalized upon because such goodwill is generally nontransferable and unmarketable, petitioner had resigned from Neches, and petitioner had signed a 10-year noncompete agreement precluding him from working in the ammonia storage industry. Finally, Mr. Burns concluded that Neches' only identifiable intangible asset of value was its incorporation status and its previously incurred incorporation costs, which he estimated to be less $10,000.

With respect to the value of a 90.39% interest in the MCI loan that Wilder contributed to Neches, Mr. Burns determined its value on the basis of a BABE collectibility assessment. The MCI loan had been acquired as part of a nonperforming loan portfolio by BABE on December 26, 2003. BABE paid $300,000 for the entire loan portfolio, which had a total outstanding balance of $139,225,253. The MCI loan, with an outstanding balance of $19,770,855,

**[*34]** represented 28.1% of the loans not designated "not collectable" or 55.2% of loans designated "collectible". Accordingly, Mr. Burns valued the MCI loan at a midpoint value of $124,900 and calculated a 90.39% interest of the loan to be worth $112,900.

Mr. Hastings also submitted two expert reports: one regarding industry due diligence standards for a sale of stock and the other regarding Wilder's profit potential in contributing a 90.39% interest in the MCI loan to Neches.[25] With

---

[25]Mr. Hastings also opined on the business purpose and economic substance of the stock sale to MidCoast and Wilder's contribution of the MCI loan interest.

The economic substance and business purpose of a transaction is a mixed question of fact and law, but the ultimate determination of whether to recharacterize a transaction because it lacks economic substance or a business purpose is a matter of law exclusively within the purview of a court. See, e.g., Shellito v. Commissioner, 437 Fed. Appx. 665, 669 (10th Cir. 2011) ("Whether the form over substance, economic substance, or similar doctrines apply, is a mixed question of fact and law; but the ultimate determination that such a doctrine applies is a matter of law which we review de novo."), vacating and remanding T.C. Memo. 2010-41; Stobie Creek Invs. LLC v. United States, 608 F.3d 1366, 1375 (Fed. Cir. 2010) ("How a transaction is characterized is a question of law we review de novo. Accordingly, we review the trial court's application of the economic substance doctrine without deference."); Townsend Indus. Inc. v. United States, 342 F.3d 890, 898 (8th Cir. 2003) (holding that a business purpose existed as a matter of law "even if 'business purpose' were to be treated as a question of fact"); Compaq Computer Corp. v. Commissioner, 277 F.3d 778, 779-780 (5th Cir. 2001) (holding that whether a transaction has economic substance or a business purpose is a "legal conclusion" subject to de novo review), rev'g 113 T.C. 214 (1999); Glass v. Commissioner, 87 T.C. 1087, 1172 (1986) (noting that in determining whether a transaction "lacked economic substance and was

(continued...)

**[*35]** respect petitioner's stock sale to MidCoast, Mr. Hastings opined that

petitioner failed to meet industry standards for financial, legal, commercial, and

integration planning due diligence. Mr. Hastings based his conclusion on the

---

$^{25}$(...continued)
therefore a sham", "we are here focusing our attention not on questions of fact but on a question of law"), aff'd sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir. 1989); cf. Shirar v. Commissioner, 916 F.2d 1414, 1417 n.3 (9th Cir. 1990) (noting that although "whether a transaction is lacking in economic substance is perhaps a mixed issue of law and fact", such determination is reviewed "under the clearly erroneous standard because it is essentially a factual determination" (citations and quotation internal marks omitted.)), rev'g T.C. Memo. 1987-492. But see Nicole Rose Corp. v. Commissioner, 320 F.3d 282, 284 (2d Cir. 2003) ("Whether a transaction lacks economic substance is a question of fact that we review under the clearly erroneous standard."), aff'g 117 T.C. 328 (2001); ACM P'ship v. Commissioner, 157 F.3d 231, 245 (3d Cir. 1998) ("[W]e review * * * [the Tax Court's] factual findings, including its ultimate finding as to the economic substance of a transaction, for clear error."), aff'g in part and rev'g in part T.C. Memo. 1997-115; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 92 (4th Cir. 1985) ("Whether under this test a particular transaction is a sham is an issue of fact[.]"), aff'g in part, rev'g in part 81 T.C. 184 (1983); Packard v. Commissioner, 85 T.C. 397, 428 (1985) ("[B]usiness purpose is a question of fact, [and] we must look to all of the facts and circumstances[.]").

An expert witness' testimony "is admissible only insofar as it assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue", and "opinions regarding the legal standards applicable to this case are outside of his competence and must be excluded." City of Tuscaloosa v. Harcros Chems., Inc.,158 F.3d 548, 565 (11th Cir. 1998); see also Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990) ("A[n] [expert] witness also may not testify to the legal implications of conduct; the court must be the * * * only source of law.") . Consequently, we give no weight to Mr. Hastings' business purpose and economic substance analysis.

[*36] following facts: (1) petitioner failed to investigate MidCoast's financial status and funding sources; (2) failed to research MidCoast's legal standing and litigation record; (3) failed to research the business mechanics of the asset recovery business; and (4) failed to investigate the operations of previously acquired entities that had allegedly been converted into the asset recovery business.

With respect to the MCI loan contribution, Mr. Hastings concluded that the potential for profit was virtually nonexistent. According to Mr. Hastings, an asset recovery firm generally expects to collect $3 for every $1 spent on a debt portfolio. One of the three dollars would pay for collection costs, another would pay for the investment itself, and the third would be profit. The loan portfolio purchased by BABE comprised 202 individual loans originated before Korea First Bank (KFB). While the exact ages of the loans are unknown, they were all originated before December 30, 1999. Mr. Hastings opined that the age of the KFB loans indicated a low probability of collection due to difficulties in locating the debtors and the likely existence of previous collection attempts. Mr. Hastings further noted that historical collections on the KFB loans had been low. Between January 1, 2000, and November 30, 2003, a total of $641,627 was collected on the entire loan portfolio, which represented a holding period collection rate of .46% of

[*37] the face amount or an annualized collection rate of .11%. No collections had occurred on the MCI loan. On the basis of these historic collection rates and Neches' lack of collection efforts, Mr. Hastings concluded that Neches' profit potential was "very limited". In fact, Mr. Hastings' profitability analysis showed that BABE and Neches would have had to collect 1.3% of the KFB portfolio's valid loan balances to merely recoup its investment and collection costs.

Mr. Hastings also opined that the contribution of only a portion of an individual loan was highly unusual in the asset recovery business because nonsyndicated loans of that size were considered illiquid investments, and thus not viable candidates for partitioning. Moreover, asset recovery firms typically did not service only portions of a particular loan.

## Discussion

I.      Background and Mechanics of an Intermediary or "Midco" Transaction

The transactions in this case have been described by the Commissioner as an intermediary transactions tax shelter (intermediary transaction). See Notice 2001-16, 2001-1 C.B. 730, clarified by Notice 2008-111, 2008-51 I.R.B. 1299. Transactions that are the same or substantially similar to those described in Notice 2001-16, supra, are identified as "listed transactions" for the purposes of section 1.6011-4(b)(2), Income Tax Regs., effective January 19, 2001. See Notice 2001-

[*38] 16, supra; Notice 2008-111, secs. 1, 6, 2008-51 I.R.B. at 1299, 1301.

Intermediary transactions have also been referred to as "Midco" transactions. See, e.g., Diebold Found., Inc. v. Commissioner, 736 F.3d 172, 175 (2d Cir. 2013), vacating and remanding Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-61.

Ordinarily, shareholders of a C corporation can dispose of their interests in two ways: an asset sale or a stock sale. In an asset sale, the C corporation triggers the built-in gain in its appreciated assets, sec. 1001, and upon a liquidating distribution to the shareholders, triggers the built-in gain in the stock itself, secs. 331, 1001. In addition, the corporation's payment of the corporate level tax reduces the amount of cash available for distribution to the shareholders. In a stock sale, the shareholders sell their stock to a third party, the C corporation continues to own its appreciated assets, and the corporate-level built-in gain is not triggered. Generally, buyers prefer to purchase assets and receive a new basis equal to the purchase price, sec. 1012, whereas sellers disfavor the sale of assets because of the attendant corporate level tax. Because a stock sale merely defers the corporate level tax liability, however, a stock sale generally commands a lower sale price than an asset sale.

**[*39]** Midco or intermediary transactions are engineered to enable buyers to receive a fair market basis in the assets and for sellers to receive a purchase price that does not fully discount for the corporate level tax liability. Notice 2001-16, 2001-1 C.B. at 730, describes an intermediary transaction as follows:

> These transactions generally involve four parties: seller (X) who desires to sell stock of a corporation (T), an intermediary corporation (M), and buyer (Y) who desires to purchase the assets (and not the stock) of T. Pursuant to a plan, the parties undertake the following steps. X purports to sell the stock of T to M. T then purports to sell some or all of its assets to Y. Y claims a basis in the T assets equal to Y's purchase price. * * *

Notice 2008-111, sec. 2, 2008-51 I.R.B. at 1299, elaborates on intermediate transactions as follows:

> An Intermediary Transaction involves a corporation (T) that would have a Federal income tax obligation with respect to the disposition of assets the sale of which would result in taxable gain (Built-in Gain Assets) in a transaction that would afford the acquiror or acquirors (Y) a cost or fair market value basis in the assets. An Intermediary Transaction is structured to cause the tax obligation for the taxable disposition of the Built-in Gain Assets to arise, in connection with the disposition by shareholders of T (X) of all or a controlling interest in T's stock, under circumstances where the person or persons primarily liable for any Federal income tax obligation with respect to the disposition of the Built-in Gain Assets will not pay that tax (hereafter, the Plan). This plan can be effectuated regardless of the order in which T's stock or assets are disposed.

**[\*40]** Notice 2008-111, sec. 3, 2008-51 I.R.B. at 1300, further explains that as a component of an intermediary transaction "[a]t least half of T's Built-in Tax that would otherwise result from the disposition of the Sold T Assets is purportedly offset or avoided or not paid."

The Court of Appeals for the Second Circuit has described one variation of a Midco transaction as follows:

> "Midco transactions" or "intermediary transactions" are structured to allow the parties to have it both ways: letting the seller engage in a stock sale and the buyer engage in an asset purchase. In such a transaction, the selling shareholders sell their C Corp stock to an intermediary entity (or "Midco") at a purchase price that does not discount for the built-in gain tax liability, as a stock sale to the ultimate purchaser would. The Midco then sells the assets of the C Corp to the buyer, who gets a purchase price basis in the assets. The Midco keeps the difference between the asset sale price and the stock purchase price as its fee. The Midco's willingness to allow both buyer and seller to avoid the tax consequences inherent in holding appreciated assets in a C Corp is based on a claimed tax-exempt status or supposed tax attributes, such as losses, that allow it to absorb the built-in gain tax liability. See I.R.S. Notice 2001-16, 2001-1 C.B. 730. If these tax attributes of the Midco prove to be artificial, then the tax liability created by the built-in gain on the sold assets still needs to be paid. In many instances, the Midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets and thus likely to be judgment-proof. The IRS must then seek payment from the other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid.

Diebold Found., Inc. v. Commissioner, 736 F.3d at 175-176.

[*41] The current case involves a twist to the intermediary transaction described above by the Court of Appeals for the Second Circuit. The tax mechanics of a Midco transaction, however, remain the same regardless of the order in which the stock sale and asset sale occurs. Notice 2008-111, sec. 2. Here, petitioner engaged in an asset sale before the stock sale. As a result, Neches had already recognized built-in gain and no longer owned any noncash assets. In both cases, the stock purchase price did not fully discount for the corporation's tax liability. In this case, MidCoast's profit comes indirectly from the asset buyer as the amount of cash left in Neches over the price the buyer paid for the stock. Finally, both variations of the transaction require Midco to prevail in offsetting the gain with losses in order for the transaction to succeed.

## II.    Legal Standard and Burden of Proof

Under section 6901, the Commissioner may proceed against a transferee of property to assess and collect Federal income tax, penalties, and interest owed by a transferor. The Commissioner may collect a transferor's unpaid tax from the transferee if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts. Sec. 6901(a); Commissioner v. Stern, 357 U.S. 39, 45 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993).

**[*42]** Section 6901 does not impose liability on the transferee but merely gives the Commissioner a procedure to collect the transferor's existing liability. Commissioner v. Stern, 357 U.S. at 42. State law determines the elements of liability, while section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability. Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961). Thus, section 6901 places the Commissioner in "precisely the same position as that of ordinary creditors under state law". Starnes v. Commissioner, 680 F.3d 417, 429 (4th Cir. 2012), aff'g T.C. Memo. 2011-63. The applicable State law is the law of the State in which the transfer occurred. Commissioner v. Stern, 357 U.S. at 45.

The Commissioner may assess transferee liability under section 6901 against a party only if three distinct requirements are met: (1) the transferor must be liable for the unpaid tax; (2) the party must be a transferee under section 6901 pursuant to Federal tax law principles; and (3) the party must be subject to liability under the applicable State law or State equity principles. Swords Trust v. Commissioner, 142 T.C. __, __ (slip op. at 31) (May 29, 2014); see also Diebold Found., Inc. v. Commissioner, 736 F.3d at 183-184; Starnes v. Commissioner, 680 F.3d at 427.

**[*43]** Section 6902(a) provides that the Commissioner bears the burden of proving that a person is liable as a transferee. See also Rule 142(d). Section 6902(a) further provides that the Commissioner does not bear the burden of proving that the transferor is liable for the underlying tax liability. See also Rule 142(d); cf. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933) (holding that the Commissioner's determinations are presumed to be correct, and the taxpayer bears the burden of proving them wrong).

III.    Neches' Federal Income Tax Liabilities

Under section 6901(a) petitioner may challenge the underlying tax liability of Neches. See also United States v. Williams, 514 U.S. 527, 539 (1995) ("[C]ertain transferees may litigate the tax liabilities of the transferor; if the transfer qualifies as a fraudulent conveyance under state law, the Code treats the transferee as the taxpayer[.]"); L.V. Castle Inv. Grp., Inc. v. Commissioner, 465 F.3d 1243, 1248 (11th Cir. 2006).

In the notice of deficiency to Neches, respondent disallowed deductions for management fees of $976,076, professional fees of $262,529, and a $17,781,501 writeoff of the MCI loan. Petitioner argues that respondent is precluded from disallowing the management fees as a business expense of Neches because, during the audit of his 2004 personal tax return, the IRS made adjustments only to certain

[*44] management fee payments to the Yacht Club, by allocating 10% of those payments to the RHC Trust. Petitioner claims that therefore "[r]espondent's attempt to recharacterize the management fees in this case is nothing more than a naked attempt to justify his litigating position". We disagree.

Petitioner appears to argue (without citing any legal authority for his proposition) that the IRS may not take inconsistent positions in determining the tax liabilities of two related taxpayers. However, we see no inconsistency in respondent's positions. Whether a payment made by Neches is includible in petitioner's income is a separate and distinct issue from whether that payment is an ordinary and necessary business expense of Neches. Petitioner bears the burden of establishing that respondent erred in disallowing Neches' claimed management fees deduction. See sec. 6902(a); Rule 142(a), (d).

At trial, petitioner testified that every month Rich International invoiced Neches for his management fees, which covered, among other things, his travel and Florida office expenses. Petitioner also produced and testified regarding three representative invoices dated December 29, 2003, January 29, 2004, and March 29, 2004, for $6,143.17, $8,704.07, and $14,042.15, respectively. These invoiced amounts appear in Neches' general ledger as well. On the basis of petitioner's testimony, the representative invoices, and Neches' general ledger, we find that

**[*45]** petitioner has established that the following management fees are ordinary

and necessary business expenses of Neches under section 162(a)(1):

| Date | Description | Amount |
|------|-------------|--------|
| 10/2/2003 | Rich International, Inc.--Invoice: 370 | $6,448.12 |
| 11/4/2003 | Rich International, Inc.--Invoice: 372 | 5,647.75 |
| 12/1/2003 | Rich International, Inc.--Invoice: 374 | 7,302.86 |
| 1/2/2004 | Rich International, Inc. | 6,143.17 |
| 2/3/2004 | Rich International, Inc.--Invoice: 378 | 8,704.07 |
| 3/3/2004 | Rich International, Inc.--Invoice: 380 | 7,731.55 |
| 4/5/2004 | Rich International, Inc.--Invoice: 382 | 14,042.15 |
| 5/4/2004 | Rich International, Inc.--Invoice: 384 | 7,182.86 |
| 6/9/2004 | Rich International, Inc.--Invoice: 387 | 9,475.38 |
| 7/2/2004 | Rich International, Inc.--Invoice: 388 | 7,135.13 |
| Total | | 79,813.04 |

With respect to the remaining management fee entries, respondent argues that the

general ledger is "replete with * * * large, round, unexplained transfers". We

agree. Petitioner has failed to substantiate, with documentary evidence or

otherwise, the remaining management fee entries in Neches' general ledger.

Petitioner also disputes respondent's disallowance of the professional fees

claimed by Neches. However, petitioner has failed to provide any evidence to

substantiate these fees and therefore has failed to meet his burden of proof.

**[\*46]** Finally, petitioner does not dispute respondent's disallowance of the bad debt loss for the MCI loan. Accordingly, we sustain respondent's determinations regarding Neches' tax liabilities for the years at issue, with the exception of $79,813.04 in management fee expenses.

IV.    Transferee Status Under Section 6901

Whether a person is a "transferee" within the meaning of section 6901 is "undisputedly [a question] of federal law". See Starnes v. Commissioner, 680 F.3d at 427.

The term "transferee" is an expansive one that includes "donee, heir, legatee, devisee, and distributee". Sec. 6901(h); see also sec. 301.6901-1(b), Proced. & Admin. Regs. ("[T]he term 'transferee' includes an heir, legatee, devisee, distributee of an estate of a deceased person, the shareholder of a dissolved corporation, the assignee or donee of an insolvent person, the successor of a corporation, a party to a reorganization as defined in section 368, and all other classes of distributees."). Moreover, section 6901 clearly contemplates for "transferee" to include not just an initial transferee, but successive transferees (a transferee of a transferee) as well. See sec. 6901(c)(1) and (2) (providing differing periods of limitations for assessment depending on whether a person is an initial transferee or a transferee of transferee).

**[*47]** Petitioner does not argue that he is not a transferee under section 6901, and we deem that issue conceded. See Mendes v. Commissioner, 121 T.C. 308, 313-314 (2003). In addition, we hold that petitioner falls within the expansive definition of transferee set forth in section 6901. With respect to the special dividend and the other pre-stock-sale asset distributions, petitioner is a distributee of Neches. With respect to the proceeds from the sale of Neches stock, petitioner is a transferee of Neches Holdings, which itself is a distributee of Neches. Having established that petitioner is a section 6901 transferee under Federal law principles, we now address whether petitioner has transferee liability under Texas State law.[26]

V.    Transferee Liability Under the Texas Uniform Fraudulent Transfer Act

In deciding matters of State law, the Court of Appeals for the Eleventh Circuit has held: "In determining the law of the state, federal courts must follow the decisions of the state's highest court, and in the absence of such decisions on an issue, must adhere to the decisions of the state's intermediate appellate courts

---

[26]Both parties agree that Texas law governs the issue of transferee liability because the transfers at issue occurred in Texas--i.e., Neches was incorporated in Texas, conducted business in Texas, had its principal place of business in Texas, declared its dividends and distributions in Texas, and had bank accounts in Texas. Moreover, both parties agree that an appeal of this case lies in the Court of Appeals for the Eleventh Circuit under sec. 7482(b) because petitioner resided in Florida when he filed his petition.

[*48] unless there is some persuasive indication that the state's highest court would decide the issue otherwise." Flintkote Co. v. Dravo Corp., 678 F.2d 942, 945 (11th Cir. 1982); see also Swords Trust v. Commissioner, 142 T.C. at ___ (slip op. at 40) (citing Commissioner v. Estate of Bosch, 387 U .S. 456, 465 (1967)) (holding that where a decision involves the applicability of State law, a Federal court must apply State law in the manner that the highest court of the State has indicated that it would apply the law), and Estate of Young v. Commissioner, 110 T.C. 297, 300, 302 (1998).

If the State's highest court has not spoken on the subject, then we must apply what we "find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State". Commissioner v. Estate of Bosch, 387 U.S. at 465. "'Only where no state court has decided the point in issue may a federal court make an educated guess as to how that state's supreme court would rule.'" Flintkote Co., 678 F.2d at 945 (quoting Benante v. Allstate Ins. Co., 477 F.2d 553, 554 (5th Cir. 1973)).

A.    Texas State Law

In 1987 Texas enacted the Uniform Fraudulent Transfer Act of 1984 (UFTA) as chapter 24 of its Business and Commerce Code (TUFTA). Tex. Bus. & Com. Code Ann. sec. 24.001 (West 2009). Chapter 24 is nearly identical in

[*49] UFTA and TUFTA.  <u>Compare</u> TUFTA ch. 24 <u>with</u> UFTA ch. 24.  TUFTA sec. 24.012 provides:  "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."  Moreover, Tex. Gov't Code sec. 311.028 (West 2013) instructs that "[a] uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it."  Finally, the Supreme Court of Texas has held that in interpreting TUFTA, courts should "ensure that * * * [their] construction * * * is as consistent as possible with the constructions of other states that have enacted a Uniform Fraudulent Transfer Act containing a similar provision."  <u>Nathan v. Whittington</u>, 408 S.W.3d 870, 873 (Tex. 2013).  Accordingly, although we apply Texas State law, we shall give due consideration to the constructions of other States that have enacted UFTA.

TUFTA has several separate and distinct fraud provisions--two constructive fraud provisions and one actual fraud provision.  The first provision, TUFTA sec. 24.006(a), is a constructive fraud provision that applies regardless of a transferor's or transferee's actual intent.  <u>E. Poultry Distribs., Inc. v. Yarto Puez</u>, No. 3:00-CV-1578, 2001 WL 34664163, at *2 (N.D. Tex. Dec. 3, 2001).  TUFTA sec. 24.006(a) provides:  "A transfer made * * * by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made * * * if the debtor made the transfer * * *

**[*50]** without receiving a reasonably equivalent value in exchange for the transfer * * * and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer".

The second provision, TUFTA sec. 24.005(a)(2), is another constructive fraud provision that applies regardless of a transferor's or transferee's actual intent. See First Nat'l Bank of Seminole v. Hooper, 104 S.W.3d 83, 85 (Tex. 2003). TUFTA sec. 24.005(a)(2) provides:

> A transfer made* * * by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made * * *, if the debtor made the transfer * * * without receiving a reasonably equivalent value in exchange for the transfer, and the debtor:
>
> \* \* \* \* \* \* \*
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Finally, the third fraud provision, TUFTA sec. 24.005(a)(1), is an actual fraud provision, which provides: "A transfer made * * * by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made * * *, if the debtor made the transfer * * * with actual intent to hinder, delay, or defraud any creditor of the debtor". TUFTA sec.

**[*51]** 24.005(b) sets forth 11 nonexclusive "badges of fraud" that may give rise to

an inference of actual intent.[27]

With these fraud provisions in mind, we now address whether any of the

transfers made by Neches to petitioner, directly or indirectly, are fraudulent

transfers under TUFTA.

B.      Special Dividend and Other Pre-Stock-Sale Distributions

1.      Transfers Made After June 1, 2004

We first address whether distributions made by Neches between June 1,

2004, and the stock sale are fraudulent transfers under TUFTA's first fraud

---

[27]Tex. Bus. & Com. Code ch. 24 (TUFTA), sec. 24.005(b) (West 2009) provides:

> In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[*52] provision, TUFTA sec. 24.006(a). Under this provision, a transfer is fraudulent as to a creditor if: (1) the creditor's claim arose before the transfer was made; (2) the debtor did not receive a reasonably equivalent value in exchange for the transfer; and (3) the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

Respondent's claim against Neches arose when Martin purchased its appreciated assets--i.e., June 1, 2004. After June 1, 2004, Neches transferred a number of assets to petitioner and to entities owned, wholly or in part, by petitioner.[28] Following the asset sale to Martin, Neches transferred to Yacht Club $499,860 in cash and a $2.5 million Koch Lien Escrow account, 10% of which accrued to the benefit of the RHC Trust. During this period Neches also transferred $200,000 in cash to Buffalo Holdings and purchased a $39,481.36

---

[28]In determining whether a party is a "transferee", Texas courts have adopted a "legal dominion or control" test--i.e., a transferee is a party who has the right to put the money or asset to his own use. See, e.g., Newsome v. Charter Bank Colonial, 940 S.W.2d 157, 165 (Tex. App. 1996) (citing In re Coutee, 984 F.2d 138, 140-141 (5th Cir. 1993) (noting that under the dominion or control test, a party is a transferee if he gains legal dominion or control over the funds)). As the sole shareholder of Rich International and Buffalo Holdings, petitioner had full dominion and control over their operations and assets. Moreover, as the creator of the RHC Trust, petitioner had dominion and control over the trust's assets. Finally, as of August 3, 2004, petitioner had full dominion and control over Yacht Club, which was owned 90% by Buffalo Holdings and 10% by the RHC Trust. Accordingly, under Texas State law, petitioner is a transferee with respect to transfers made to entities under his dominion and control.

[*53] Toyota vehicle for petitioner. Finally, Neches distributed a number of assets, which it had valued at $3,727,121.21, in satisfaction of a special dividend to petitioner. Neches did not receive any value, much less "reasonably equivalent" value, in exchange for these transfers. Finally, Neches became insolvent as a result of these transfers[29]--after distributing the special dividend, Neches' liabilities exceeded its assets by over $260,000.[30] Accordingly, we conclude that Neches' pre-stock-sale distributions made after June 1, 2004, including the special dividend, are fraudulent under TUFTA sec. 24.006(a).

---

[29]These transfers were part of a series of transfers made to remove from Neches cash and noncash assets until only a "magical" amount of cash remained. For the purposes of determining insolvency, Texas courts have looked to whether related transfers, in the aggregate, rendered the debtor insolvent. See, e.g., Arriaga v. Cartmill, 407 S.W.3d 927, 928 , 932 (Tex. App. 2013) (finding that the debtor was insolvent after transferring two properties to his son "shortly after" his appeal was dismissed); Shelley v. Walnut Place Nursing Home, No. 05-94-01047-CV, 1995 WL 73094, at *5 (Tex. App. Feb. 23, 1995) (finding that the debtor was insolvent after transferring two properties after a lawsuit was initiated but before the judgment was rendered) (not designated for publication). Moreover, insolvency is to "be evaluated from the creditor's perspective." Nat'l Loan Invs., L.P. v. Robinson, 98 S.W.3d 781, 784 (Tex. App. 2003).

[30]We discredit Mr. Burchett's opinion that Neches was solvent on August 19 and 25, 2004. Mr. Burchett's solvency opinion was contingent on the payment of Neches' Texas State franchise tax liability. Neches' Texas State franchise tax liability was never paid.

**[*54]**     2.     Transfers Made Before June 1, 2004

Next, we address whether distributions made by Neches between May 3 and June 1, 2004, are fraudulent transfers under TUFTA's second fraud provision, TUFTA sec. 24.005(a)(2).  Unlike TUFTA's first fraud provision, which applies only to fraudulent transfers with regard to existing creditors, TUFTA's second and third fraud provisions apply to present and future creditors.  Osherow v. Nelson Hensley & Consol. Fund. Mgmt., L.L.C. (In re Pace), 456 B.R. 253, 266 (Bankr. W.D. Tex. 2011).  Compare TUFTA sec. 24.006(a) with TUFTA sec. 24.005.  Under TUFTA's second fraud provision, a transfer "is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made" (emphasis added) if:  (1) the debtor did not receive reasonably equivalent value in exchange for the transfer; and (2) the debtor intended, believed, or reasonably should have believed that he would incur debts beyond his ability to pay.  TUFTA sec. 24.005(a)(2).

Neches made a number of transfers to entities controlled by petitioner before June 1, 2004--i.e., the date the Martin asset sale closed and the date on which respondent's claim against Neches arose.  In May Neches made transfers totaling $75,000 to Rich International and $20,000 to Yacht Club (10% of which is attributable to the RHC Trust).  As with the earlier discussed transfers, Neches

[*55] did not receive any value, much less "reasonably equivalent" value, in return for these transfers.

These transfers were made after Neches signed a nonbinding term sheet regarding the sale of its operating assets on May 3, 2004. Therefore, respondent's claim, which arose within a month of the transfers, arose within a reasonable time after the transfers. See West v. Seiffert (In re Houston Drywall, Inc.), No. 05-95161-H4-7, 2008 WL 2754526, at *19 n.23 (Bankr. S.D. Tex. July 10, 2008) (holding that claim that arose one year after the transfer was within a "reasonable time" under TUFTA sec. 24.005(a)(2)); cf. Williams v. Performance Diesel, Inc., No. 14-00-00063-CV, 2002 WL 596414, at *4 (Tex. App. April 18, 2002) (holding that although the definition of "reasonable time" under TUFTA is not specifically defined, the four-year statute of limitations suggests that a "reasonable time" is within four years).

Finally, we find that Neches, through petitioner, intended to incur debts beyond its ability to pay. As of early May Neches had signed a term sheet for the sale of its operating assets. Petitioner knew that because of Neches' low basis in its assets, Neches would incur substantial capital gain tax liability as a result of the sale. Moreover, during the pendency of the asset sale, petitioner intended to enter into a stock enhancement transaction as a "next step". In fact, petitioner had kept

[*56] in routine contact with Mr. Wellington of MidCoast since August 2003 and had even told Mr. Wellington that an asset sale closing "looks good" in 2004. Petitioner understood that the shareholder premium in a stock enhancement transaction represented a percentage of the acquired corporation's tax liability, and he knew that the buyer saw the tax liability as an asset that it could use. Moreover, petitioner intended to remove assets from Neches until only a "magical amount of cash" remained. We therefore conclude that at the very least, petitioner reasonably should have known that by entering into an asset sale followed by a stock enhancement transaction, Neches would incur tax liabilities beyond its ability to pay.

Accordingly, we conclude that Neches' pre-stock-sale distributions made after May 3, 2004, are fraudulent under TUFTA sec. 24.005(a)(2).

C.   Sale of Neches' Stock to MidCoast

     1.    Collapsing Transaction Under Texas State Law

The parties have not cited, and we did not find, any cases in which a series of transactions was treated as a single transaction under TUFTA. Nonetheless, respondent contends that we should look to HBE Leasing Corp. v. Frank, 48

**[*57]** F.3d 623 (2d Cir. 1995), and <u>Diebold Found., Inc. v. Commissioner</u>, 736

F.3d 172,[31] to recharacterize (under Texas State law) the $3.76 million stock sale

as a liquidating distribution of $6.23 million.

In <u>Bowman v. El Paso CGP Co., LLC</u>, 431 S.W.3d 781, 788 (Tex. App.

2014), the Court of Appeals of Texas explained:

> "Courts will generally look past the form of a transaction to its
> substance. 'Thus an allegedly fraudulent conveyance must be
> evaluated in context; where a transfer is only a step in a general plan,
> the plan must be viewed as a whole with all its composite
> implications.'" <u>Official Comm. Unsecured Creditors of Grand Eagle
> Cos. v. ASEA Brown Boverie, Inc.</u>, 313 B.R. 219, 229 (N.D. Ohio
> 2004) (quoting <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31, 35 (2d Cir.
> 1993)).

In <u>Orr v. Kinderhill Corp.</u>, 991 F.2d 31, 35-36 (2d Cir. 1993), the Court of

Appeals for the Second Circuit held that under the New York UFCA, a transfer of

---

[31]Although <u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623 (2d Cir. 1995), and <u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d 172 (2d Cir. 2013), are analyzed under the Uniform Fraudulent Conveyance Act (UFCA), the predecessor statute to UFTA, they are nonetheless instructive to our analysis because the collapsing of transactions is a common law doctrine which would not have been supplanted by Texas' adoption of UFTA. <u>Cf.</u> <u>Waffle House, Inc. v. Williams</u>, 313 S.W.3d 796, 802 (Tex. 2010) (holding that "the legislative creation of a statutory remedy is not presumed to displace common-law remedies", that "abrogation of common-law claims is disfavored", and that courts may only "construe the enactment of a statutory cause of action as abrogating a common law claim if there exists 'clear repugnance' between the two causes of action"). Moreover, UFTA (and TUFTA) expressly contemplates supplementation by the common law. UFTA sec. 10; TUFTA sec. 24.011 ("Unless displaced by the provisions of this chapter, the principles of law and equity * * * supplement its provisions.").

[*58] property for corporate shares and a subsequent distribution of those shares by a debtor corporation should be viewed as a whole in determining whether the corporation received fair consideration. The court explained: "So viewed, the restructuring was not supported by fair consideration for, in effect, it was a gratuitous transfer of the New York Property by * * * [the debtor corporation]." Id. at 36.

The Court of Appeals of Texas in Bowman, 431 S.W.3d at 783, focused on the substance of what occurred between a debtor corporation and its shareholder to determine whether the corporation received reasonable equivalent value. The court held that because the shareholder allegedly transferred more money to the corporation than the corporation transferred to the shareholder in the aggregate, there was a genuine issue of material fact about whether the corporation received "reasonably equivalent value". Id. at 788-789.

**[\*59]** Mindful of TUFTA sec. 24.012,[32] Tex. Gov't Code sec. 311.028,[33] direction

from the Texas Supreme Court,[34] and the Court of Appeals of Texas' example in

Bowman, we look to caselaw decided under New York UFCA as persuasive

authority in determining whether the substance of the transactions in this case is

that of a liquidating distribution.

"It is well established that multilateral transactions may under appropriate

circumstances be 'collapsed' and treated as phases of a single transaction". HBE

Leasing, 48 F.3d at 635 (citing Orr, 991 F.2d at 35-36). In HBE Leasing, 48 F.3d

at 635, the court described a "paradigmatic scheme" under this collapsing doctrine

in which "[o]ne transferee gives fair value to the debtor in exchange for the

debtor's property, and the debtor then gratuitously transfers the proceeds of the

first exchange to a second transferee. The first transferee thereby receives the

---

[32]TUFTA sec. 24.012 provides: "This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it."

[33]Tex. Gov't Code sec. 311.028 (West 2013) instructs: "A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it."

[34]In Nathan v. Whittington, 408 S.W.3d 870, 873 (Tex. 2013), the Supreme Court of Texas has held that in interpreting TUFTA, courts should "ensure that * * * [their] construction * * * is as consistent as possible with the constructions of other states that have enacted a Uniform Fraudulent Transfer Act containing a similar provision."

[*60] debtor's property, and the second transferee receives the consideration, while the debtor retains nothing."

These transactions can be collapsed if two requirements are met: (1) "the consideration received from the first transferee must be reconveyed by the debtor for less than fair consideration or with an actual intent to defraud creditors"; and (2) "the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." Id.

Respondent argues that the true substance of the stock sale and subsequent transactions is a liquidating distribution to petitioner of $6.23 million. We disagree.

The collapsing of a multilateral transaction into a single transaction is appropriate only where the outcomes of the multilateral transaction and the recast transaction are substantively similar.

As petitioner correctly points out, before the stock sale petitioner held all of Neches' stock with a value of negative $261,614, and MidCoast held $3,761,433 in cash (i.e., $3,486,433 for Neches stock and $275,000 for professional fees petitioner owed to Morgan Joseph). Following the stock sale petitioner had $3,486,433 in cash, Morgan Joseph had $275,000 in cash, and Neches Holdings

**[*61]** held all of Neches' stock. Both before and after the stock sale Neches held $6,232,970 in cash and owed $6,494,584 in Federal and State tax liabilities. Although MidCoast and Neches Holdings ultimately removed $5,732,890 in cash from Neches before selling it to Wilder, these distributions occurred after the stock sale and without petitioner's knowledge. Even if we were to find that petitioner had constructive knowledge of these post-stock-sale distributions, petitioner was not a recipient of those distributions--MidCoast and Neches Holdings were. Therefore, we conclude that a liquidating distribution of $6.23 million to petitioner does not reflect the true substance of the stock sale and subsequent transactions.

Respondent's reliance on HBE Leasing and Diebold Found. is misplaced. First, HBE Leasing, is distinguishable from the current case. In HBE Leasing, 48 F.3d at 636-637, the debtor gave a transferee a mortgage in return for mortgage proceeds of $250,000, which it immediately passed on to its majority shareholder. The court held that the net result of these transactions was that the transferee received a mortgage from the debtor, the majority shareholder received $250,000 from the transferee, and the debtor itself received nothing. Finding that the transferee had constructive knowledge that the debtor might improperly funnel the mortgage proceeds to third parties, id. at 637, the court held that the two

[*62] transactions should be collapsed into a single transaction in which the transferee received a mortgage from the debtor and the debtor received nothing in return, id. at 635-637.  Unlike the transferee in HBE Leasing, petitioner engaged in a transaction with a third party--i.e., MidCoast--not the debtor--i.e., Neches.  Thus, the first prong of the test set forth in HBE Leasing is not satisfied.  Moreover, in HBE Leasing, the transferee held a $250,000 mortgage regardless of whether the transactions were collapsed.  In contrast, under respondent's theory, petitioner would be deemed to have received $6.23 million in a liquidating distribution, rather than the $3.76 million (i.e., $3,486,433 in cash and the assumption of his $275,000 obligation to Morgan Joseph) he actually received.

Diebold Found. is likewise distinguishable.  In Diebold Found., Inc. v. Commissioner, 736 F.3d at 175-181, the following transactions occurred:  (1) shareholders of Double D, a corporation which held primarily highly appreciated publicly traded securities and real estate, sold their Double D shares to Shapp II for $309 million; (2) Shapp II sold the publicly traded securities to Morgan Stanley, leaving Double D with $319 million in assets and a large capital gain tax liability; and (3) Shapp II distributed to the shareholders the $309 million, at least partially, from the proceeds of its sale of the publicly traded securities.  The court held that if "the [above] transactions are collapsed, they will be treated as though

**[*63]** Double D sold all of its assets and made a liquidating distribution to the Shareholders". Id. at 187. In Diebold Found., the cumulative effect of the transactions resulted in the shareholders' receiving nearly 97% of the value of Double D's assets. In such circumstances, collapsing the multiple business deals and recharacterizing sale proceeds as a liquidating distribution fairly reflects the true substance of the transactions. In contrast, petitioner received only 60% of the value of Neches' assets. We therefore conclude that the true substance of the stock sale and subsequent transactions in this case is not that of a liquidating distribution to petitioner. Accordingly, we decline to recast the $3.76 million of stock sale proceeds as a $6.23 million liquidating distribution.

Our inquiry does not end just because petitioner is a transferee of Neches Holdings rather than of Neches with respect to the stock sale proceeds. Petitioner may still be liable under a transferee-of-transferee theory.

### 2. Transferee-of-Transferee Liability

Although petitioner is not an initial transferee of Neches' cash holdings, he nonetheless has liability as a transferee of a transferee. In Sawyer Trust of May 1992 v. Commissioner, 712 F.3d 597, 606, 612 (1st Cir. 2013), rev'g and remanding T.C. Memo. 2011-298, the Court of Appeals held that the Tax Court

[*64] overlooked transferee-of-transferee liability under UFTA[35] and remanded to the Tax Court for further analysis under a transferee-of-transferee theory of liability.

The facts in Sawyer Trust are similar to the facts of the current case. In Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 599-602, a shareholder trust held a 100% interest in four C corporations with large built-in gains. Two of the corporations were taxi corporations and the other two were real estate corporations. Id. In order to generate the funds necessary to satisfy some large estate tax liabilities, the trustee decided to sell certain highly appreciated assets of the C corporations. Id. The trustee further decided to sell the stock in the corporations to Fortrend, an entity similar to MidCoast. Id. The stock sale involved the following steps: (1) "the corporations liquidated their assets and satisfied all of their nontax liabilities, leaving the corporations with nothing but cash and tax liabilities"; and (2) "Trust sold all of its stock in the corporations to various acquisition corporations [that] Fortrend had formed" for "a price equal to the value of the companies' assets (which by that point consisted only of cash)

---

[35]Like Texas, Massachusetts, the State whose substantive law controlled in Sawyer Trust of May 1992 v. Commissioner, 712 F.3d 597, 603 (1st Cir. 2013), rev'g and remanding T.C. Memo. 2011-298, also adopted the Uniform Fraudulent Transfer Act of 1984.

[*65] minus a percentage of the value of the companies' Federal and State tax liabilities." Sawyer Trust of May 1992 v. Commissioner, T.C. Memo. 2014-59, at *3-*4. In total, Fortrend paid the trust more than $32.4 million for the taxi corporations, whose combined net book value was only about $25.3 million, and about $23.4 million for the real estate corporations, whose combined net book value was only about $16.9 million. Id. at *4-*5. At the time of the stock sale, all four corporations were comfortably solvent: the two taxi corporations had about $39.6 million in cash and about $14.3 million of tax liability, and the two real estate corporations had about $27.5 million in cash and about $10.5 million of tax liabilities. Id. By yearend Fortrend had caused the four corporations to make numerous transfers that ultimately left them with a combined cash balance of approximately $690,000, while their combined tax liability remained at about $24.8 million. Id.

As explained by the Court of Appeals for the First Circuit:

> If the IRS has a fraudulent transfer claim against * * *[the Fortrend acquisition vehicles], then the IRS is also a creditor of * * * [the Fortrend acquisition vehicles] under the Massachusetts Uniform Fraudulent Transfer Act. See id. [Mass. Gen. Laws ch. 109A] § 2 ("creditor" is "person who has a claim"). And if it is a creditor of * * * [the Fortrend acquisition vehicles], the IRS can recover not only from * * * [the Fortrend acquisition vehicles themselves], but also from parties who received fraudulent transfers from * * * [the Fortrend acquisition vehicles]. * * *

[*66] <u>Sawyer Trust of May 1992 v. Commissioner</u>, 712 F.3d at 607-608.

On remand we found that the shareholder trust was liable as a transferee of a transferee, but limited the amount of recovery to the premium (value received in excess of the corporations' fair market value) because the trust was a good-faith transferee.[36]  <u>Sawyer Trust of May 1992 v. Commissioner</u>, T.C. Memo. 2014-59. Under the facts of <u>Sawyer Trust of May 1992 v. Commissioner</u>, at *9, the initial fraudulent transfer occurred when Fortrend caused the companies to distribute its cash to the Fortrend acquisition entities, the initial transferees.[37]  At the time of these transfers, the IRS was already a creditor of the companies, and as a result of

_____

[36]Unlike the taxpayer in <u>Sawyer Trust of May 1992 v. Commissioner</u>, T.C. Memo. 2014-59, petitioner was not a good-faith transferee.  <u>See</u> discussion <u>supra</u> p. 48, sec. V. pt. B.2.  Moreover, petitioner would not have benefited from good-faith transferee status because he transferred an asset of negative value to Neches Holdings.  <u>See</u> TUFTA sec. 24.009(d)(1) ("Notwithstanding voidability of a transfer * * * under this chapter, a good faith transferee * * * is entitled, at the transferee's * * * election, to the extent of the value given the debtor for the transfer * * * [to] a reduction in the amount of the liability on the judgment.").

[37]Our use of the words "initial" and "subsequent" does not signify a temporal relationship.  Rather, these words specify a relationship to the debtor-- i.e., the initial transfer is a transfer by a debtor to a(n) (initial) transferee, and a subsequent transfer is a transfer from a transferee (whether initial or subsequent) to another (subsequent) transferee.  In <u>Sawyer Trust of May 1992</u>, the debtors were the acquired corporations.  The distribution of cash from the debtor to Fortrend/the Fortrend acquisition entities (initial transferees) was the initial transfer.  The transfer of the stock purchase price from Fortrend/the Fortrend acquisition entities to the trust (subsequent transferee) was the subsequent transfer. Note that the "subsequent transfer" occurred <u>before</u> the "initial transfer".

[*67] the transfers, became a creditor of the Fortrend acquisition entities as well. Id. The Court then found that the stock sale proceeds received by the trust was a fraudulent transfer from the Fortrend acquisition entities because the following factors were met: (1) Fortrend did not receive a reasonably equivalent value in exchange for the transfer and (2) Fortrend intended to incur, believed, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. Id. at *9-*16. In performing its analysis, the Court did not distinguish between Fortrend and the Fortrend acquisition vehicles. Moreover, the Court found transferee-of-transferee liability even though the IRS did not become a creditor of the Fortrend acquisition entities until after the stock sale--i.e., upon the later-occurring "initial transfer" of cash from the acquired corporations to the Fortrend acquisition entities. This is because under UFTA sec. 4, a creditor's claim can arise either "before or after the transfer was made". Cf. TUFTA sec. 24.005 (requiring the creditor's claim to arise "before or within a reasonable time after the transfer was made").

Similarly, in this case, the initial transfer occurred when Neches distributed approximately $5.5 million to MidCoast (via Neches Holdings) following the stock sale. In each of these cash distributions, Neches received a demand note from Neches Holdings in the same amount. Accordingly, these distributions may

**[*68]** be viewed as transfers of cash from Neches to Neches Holdings, followed by

subsequent transfers from Neches Holdings to MidCoast.

At the time of these transfers, the IRS was a creditor of Neches,[38] Neches

was <u>insolvent, and Neches did not receive any value in exchange</u>.[39]  These

---

[38]The IRS generally becomes a creditor of a taxpayer as of the date the obligation to pay the tax accrues.  In this case, the IRS became a creditor of Neches for the capital gain of Neches' assets at the time of the assets sale to Martin--i.e., June 1, 2004.

In <u>Zahra Spiritual Trust v. United States</u>, 910 F.2d 240, 248 (5th Cir. 1990) (quoting <u>Frees v. Baker</u>, 16 S.W. 900, 901 (Tex. 1891)), the Court of Appeals for the Fifth Circuit explained:

> The Texas courts have given a broad construction to the term creditor, so that the [Texas Fraudulent Transfers] Act "protects the holders of unliquidated unmatured contingent claims."  <u>See</u> <u>Burnett v. Chase Oil & Gas, Inc.</u>, 700 S.W.2d 737, 743 (Tex. App.--Tyler 1985, no writ).  As the <u>Burnett</u> court put it, "[t]he existing creditors who may attack the transfer need not have been the owners of a fully matured and liquidated debt."  <u>Id.</u>

> "The character of the claim, if it is just and lawful, is immaterial.  It need not be due; for, although the holder cannot maintain an action until it is due, he nevertheless has an interest in the property as a fund out of which the demand ought to be paid. . . .  A contingent claim is as fully protected as one that is absolute."

[39]The Neches Holdings demand notes were valueless because MidCoast and Neches Holdings never intended to repay Neches.  Shortly after the cash distributions, Neches Holdings sold Neches to Wilder in exchange for Wilder's assumption of the demand note obligations.  On that very same day, Wilder

(continued...)

[*69] transfers were therefore fraudulent under TUFTA sec. 24.006(a), and, as a result, the IRS became a creditor of Neches Holdings on August 31, 2004, by virtue of its claim against Neches Holdings. See TUFTA sec. 24.002(4) ("'Creditor' means a person* * *who has a claim."). As a creditor to Neches Holdings, the IRS can recover not only from Neches Holdings, but also from parties who received fraudulent transfers from it.[40]

A slight wrinkle is introduced because the stock purchase funds came from a MidCoast account. We find that while the funds may have originated from MidCoast's account, Neches Holdings actually paid for the Neches stock. On the date of the stock sale, Neches Holdings borrowed $3,386,433 from MidCoast by demand note. We further find that MidCoast contributed to Neches Holdings the difference between the demand note amount and the $3,761,433 paid to petitioner during the stock sale. Therefore, we must determine whether the $3,761,433 that Neches Holdings transferred to petitioner constitutes a fraudulent transfer.

---

[39](...continued) declared a dividend of the demand notes. At that point, both the receivable and obligation to pay were held by Wilder, which effectively canceled out the demand notes.

[40]See also TUFTA sec. 24.009(b)(2) (in addition to initial transferees, liability may be imposed on "any subsequent transferee other than a good faith transferee who took for value").

**[*70]**               a. <u>Constructive Fraud</u>

Under TUFTA's second fraud provision, a transfer "is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made" if: (1) the debtor did not receive reasonably equivalent value in exchange for the transfer and (2) the debtor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." TUFTA sec. 24.005(a)(2).

First, the IRS became a creditor of Neches Holdings (i.e., on August 31, 2004) within a reasonable time after its transfer to petitioner (i.e., on August 25, 2004). Second, Neches Holdings received an asset of negative value in exchange for the transfer. Finally, Neches Holdings knew or should have known that its purchase of Neches would cause it to incur debts beyond its ability to pay. Like Fortrend in <u>Sawyer Trust</u>, Neches Holdings purchased Neches using approximately $3.4 million in loan proceeds and $0.36 million contributed by MidCoast. As a new entity formed solely to acquire Neches, Neches Holdings had no other assets or income. Therefore, Neches Holdings could not have repaid the $3.4 million loan and the $6.5 million in tax liabilities (with its $6.2 million in cash) unless its tax avoidance strategy succeeded.

[*71] Moreover, Neches Holdings could not have reasonably expected its tax avoidance strategy to succeed. First, Neches Holdings entered into these transactions against the backdrop of Notice 2001-16, supra, which designated these intermediary transactions as tax shelters.[41] Second, Neches Holdings purchased Neches with the sole purpose of offsetting its large tax liabilities with acquired losses. "[T]he law is quite clear that transactions having no business purpose other than avoiding taxes will not be respected." Sawyer Trust of May 1992 v. Commissioner, at *12-*13 (citing Gregory v. Helvering, 293 U.S. 465, 469-470 (1935)). Consequently, Neches Holdings should have known that by purchasing Neches, it would incur debts beyond its ability to pay.

### b. Actual Fraud

In addition to being constructively fraudulent, the transfer of the stock sale proceeds from Neches Holdings to petitioner is fraudulent under TUFTA's actual fraud provision as well. Under TUFTA sec. 24.005(a)(1), a transfer is fraudulent as to a creditor if: (1) the creditor's claim arose before or within a reasonable time

---

[41]Mr. Wellington of MidCoast testified that MidCoast had developed a number of talking points in response to certain proclamations by the IRS and the Emerging Issues Task Force so that it could address the objections and concerns of sellers, who were worried about violating the tax laws.

[*72] after the transfer was made; and (2) if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor.

As established above, respondent's claim against Neches Holdings arose shortly (and within a reasonable time) after it transferred the stock sale proceeds to petitioner. In addition, we find that Neches Holdings' sole purpose in entering into the stock sale and subsequent transactions was to profit by avoiding Federal tax liability. Therefore, we find that Neches Holdings had actual intent to "hinder, delay, or defraud" the IRS.

In conclusion, petitioner received a fraudulent transfer from Neches Holdings of $3,761,433 and is therefore liable as a transferee of a transferee of Neches.

VI.    Respondent's Collection Efforts

Petitioner argues that respondent may not collect Neches' unpaid tax liabilities from petitioner because respondent failed to make reasonable collection efforts. In Zadorkin v. Commissioner, T.C. Memo. 1985-137, 49 T.C.M. (CCH) 1022, 1028 (1985) (quoting Sharp v. Commissioner, 35 T.C. 1168, 1175 (1961)), we held that "[b]ecause transferee liability under section 6901 is a secondary liability, respondent must show that 'all reasonable efforts were made to collect the tax liability from the transferor before proceeding against the transferee.'".

**[*73]** With respect to the pre-stock-sale transfers, the transferor is Neches. We find that RO Young engaged in all reasonable efforts to collect from Neches. RO Young filed Federal tax liens on Neches' assets in both Texas and Florida, searched various databases for assets belonging to Neches, and levied on the few assets that he had found. Moreover, petitioner does not argue that respondent's collection efforts were unreasonable with respect to Neches.

With respect to the stock sale proceeds, the transferor is Neches Holdings. "Where * * * the transferor is hopelessly insolvent, the creditor is not required to take useless steps to collect from the transferor. The reasonableness of the collection efforts depends upon the facts of the individual case." Id. In this case, Neches Holdings was hopelessly insolvent after it distributed the cash it had received from Neches to MidCoast. At that time, Neches Holdings owed MidCoast approximately $3.4 million, it owed Neches approximately $5.5 million, and as a new entity formed solely to acquire Neches (itself an insolvent company), it had no other assets or income. Accordingly, we find that respondent acted reasonably in declining to take useless steps to collect from Neches Holdings.

Petitioner argues that respondent may not collect from petitioner because he did not attempt to collect from Mr. Stone (shareholder of Wilder), his entities (i.e., Wilder, BABE, Starwalker, and Korea Star), or his counterparties. Petitioner cites

**[*74]** no authority for his proposition that respondent had to pursue all potential transferees. We have held:

> It is well settled that a transferee is severally liable for the unpaid tax of the transferor to the extent of the assets received and other stockholders or transferees need not be joined. Phillips v. Commissioner, 283 U.S. 589 [(1931)]. In the event that one transferee is called upon to pay more than his pro rata share of the tax, he is left to his rights of contribution from the other transferees.

Estate of Harrison v. Commissioner, 16 T.C. 727, 731 (1951) (construing predecessor statute); see also Alexander v. Commissioner, 61 T.C. 278, 295 (1974) (holding that "[t]ransferee liability is several" under section 6901).

Because liability under section 6901 is several, respondent may proceed against any or all transferees. Accordingly, respondent may seek to collect from petitioner the lesser of: (1) the amount of fraudulent transfers under State law that petitioner received, directly or indirectly, from Neches and (2) the amount of Neches' deficiencies, penalties, and interest. See Kreps v. Commissioner, 42 T.C. 660, 670 (1964), aff'd, 351 F.2d 1 (2d Cir. 1965); Feldman v. Commissioner, T.C. Memo. 2011-297, 102 T.C.M. (CCH) 612, 621 (2011) ("Transferee liability under section 6901 includes related additions to tax, penalties, and interest owed by the transferors."); see also Schussel v. Werfel, 758 F.3d 82 (1st Cir. 2014) (pertaining to the calculation of prejudgment interest on transferee liability.)

**[*75]** In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.